# MARYLAND STATE DEPARTMENT OF HEALTH AND MENTAL HYGIENE ET AL. *v.* PRINCE GEORGE'S COUNTY DEPARTMENT OF SOCIAL SERVICES ET AL.

[No. 456, September Term, 1980.]

*Decided December 16, 1980.*

The cause was argued before GILBERT, C. J., and LOWE and MASON, JJ.

*Ellen A. Callegary, Assistant Attorney General,* and *Daniel J. O'Brien, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellants.

*Richard C. Daniels,* with whom was *Paul M. Nussbaum* on the brief, for appellee Board of Education of Prince George's County. *Ronald D. Schiff* for the parents of Linda G. *Allen J. Kruger* on the brief for appellee Linda G.

GILBERT, C. J., delivered the opinion of the Court.

## I.

## — THE PREFACE —

Everyone seems to agree that Linda G. is a child in need of assistance (CINA) as defined in Md. Cts. & Jud. Proc. (1980 Repl. Vol.) Code Ann. § 3-801 (e).[1] The disagreement

---

\* Note: *Certiorari* denied, Court of Appeals of Maryland, April 16, 1981.
1. The evidence concerning Linda's parents' ability to pay was entirely implied. There was no direct evidence of their financial inability to pay for Linda's care at Taylor Manor. Notwithstanding Courts Art. § 3-801 (e) and

resulting in this appeal has arisen over which institution, public or private, is to furnish that assistance, and of more importance to the parties, just who is to pay for it.

On March 13, 1980, by order of the Circuit Court for Prince George's County (sitting as a juvenile court), Linda G. was placed in the custody of the appellant, the Maryland Department of Health and Mental Hygiene (DHMH).[2] The court further directed the appellant to pay the cost of Linda's care at Taylor Manor, a privately owned hospital.

For approximately two years prior to the order, Linda had been receiving inpatient treatment at Taylor Manor. Her

---

§ 3-819 (d), the trial court and the parties seem to have taken for granted that Linda fell within the definition of a child in need of assistance, and that the petitioner established that fact by a preponderance of the evidence.

On oral argument, the State acknowledged its oversight at the trial level. The failure of the record to disclose that Linda G. is a CINA raises a serious question of whether the appeal is properly before us. Nevertheless, in view of the fact that all parties and the trial court apparently "assumed" that Linda G. fell within the ambit of a CINA and further seemingly "assumed" her parents were "unable" to provide the necessary medical care because their insurance "ran-out," we shall also make, for the purpose of this appeal, that assumption.

Courts Art. § 3-801 (e) provides:

"(e) *'Child in need of assistance'* is a child who requires the assistance of the court because
(1) He is mentally handicapped or is not receiving ordinary and proper care and attention, and
(2) His parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and his problems provided, however, a child shall not be deemed to be in need of assistance for the sole reason he is being furnished nonmedical remedial care and treatment recognized by State law."

Section 3-819 (d) states: "In all other cases [including a CINA adjudication] the allegations must be proved by a preponderance of the evidence."

There was, however, testimony that the parents, before Linda's commitment to Taylor Manor, attempted to have her placed in Crownsville State Hospital and various private facilities, but that effort was rebuffed because no space was available. Spring Grove State Hospital did accept Linda on the basis of the statements of two physicians. *See* Md. Ann. Code art. 59, § 12 (b). Over the objection of her parents, she was discharged a few weeks later after completion of commitment hearings.

By the time the case went to hearing on the CINA petition, space in an appropriate State facility became available. The question then arose as to the deleterious effect, if any, that moving Linda from Taylor Manor to a State operated mental hospital would have on the child.

**2.** Throughout this opinion, we shall refer to the appellant as either "the appellant" or "DHMH." By Laws 1976, ch. 746, there was created within the DHMH a separate agency known as Mental Hygiene Administration. *See also* Md. Ann. Code art. 59, § 4.

expenses were paid by her parents.[3] By March of 1979, Linda's parents' insurance coverage expired and they turned to the State for help. A petition was filed in the juvenile court for Prince George's County to have Linda declared to be a child in need of assistance,[4] and to obtain an order from the court that the appellee, the Prince George's County Department of Social Services (PGDSS), assume the financial responsibility for Linda's treatment at Taylor Manor. The juvenile court judge, by order of April 26, 1979, placed Linda in the custody of both PGDSS and DHMH. The judge directed that PGDSS and DHMH were each to pay Taylor Manor $1,500 per month for Linda's care and treatment. Interestingly, DHMH was not even a party to the case when the order directing it to pay was passed. A motion for reconsideration was granted at which time the appellant, together with the Maryland Department of Human Resources and the Prince George's County Board of Education, were joined as party defendants.

A hearing was held on March 13, 1980. All the parties to the hearing except the DHMH were dismissed. The appellant "or . . . [its] appropriate agents . . . [were ordered by the court to] undertake the financial responsibility for the care and treatment of Linda [G.] at the Taylor Manor Hospital [a private facility] . . . in the amount of . . . $3,100.00 per month. . . ." Foreseeing all sorts of financial and budgetary problems that might arise should the juvenile court's order be allowed to stand, DHMH appealed.

We shall reduce the many issues raised by the appellants to their least common demoninator.[5] Once that is done, the

---

3. The record indicates that Mr. and Mrs. G. had been receiving some financial aid in the form of "hospital [educational] instructions" from Prince George's County Board of Education.

4. Md. Cts. & Jud. Proc. (1980 Repl. Vol.) Code Ann. § 3-810 (a), § 3-812 (a).

5. The issues as raised by DHMH were:

"I. THE JUVENILE COURT EXCEEDED ITS STATUTORY AUTHORITY UNDER THE JUVENILE CAUSES ACT.

A. Under The Juvenile Causes Act A Juvenile Court May Commit A Child To The Care And Custody Of The Department Of Health And Mental Hygiene, But The Court Is Not Empowered To Order A Private

question before us becomes: May a juvenile court judge order the Secretary of the DHMH to assume the obligation to pay

Psychiatric Hospital Placement At The Health Department's Expense.

B. The Need For Equitable And Effective Allocation Of Finite State Funds Supports A Finding That The Lower Court Exceeded Its Authority.

II. THE LOWER COURT'S ORDER VIOLATES THE SEPARATION OF POWERS CLAUSE OF THE MARYLAND CONSTITUTION'S DECLARATION OF RIGHTS.

A. The Lower Court Is Constitutionally Without Authority To Interfere With The Lawful Exercise Of Administrative Discretion.

B. Funding Levels For State Agencies Are Determined By The Governor, And The Court Has No Authority To Control His Discretion.

III. THERE IS NO EVIDENCE TO SUPPORT THE LOWER COURT'S FINDING THAT THERE WERE NO AVAILABLE STATE FACILITIES FOR LINDA AS OF APRIL 5, 1979 AND AS OF THE MARCH 5th ORDER.

A. The Muncie Center Program Was And Continues To Be An Available Appropriate Treatment Center For Linda.

B. There Is No Evidence To Support The Lower Court's Finding That There Were No Available State Facilities As of April 5, 1979.

1. The lower court erroneously relied upon the IAC Meeting to support its finding that there were no available State facilities as of April 5, 1979.

2. The fact that the Muncie Center is not within Linda's catchment area will not support the court's finding that there was no available State facility as of April 5, 1979.

IV. THE PRINCE GEORGE'S COUNTY BOARD OF EDUCATION BEARS PARTIAL FINANCIAL RESPONSIBILITY FOR THE PLACEMENT OF HANDICAPPED STUDENTS IN RESIDENTIAL PROGRAMS IF SUCH PLACEMENTS ARE A NECESSARY COMPONENT OF THE STUDENT'S EDUCATIONAL PROGRAM.

A. Where A Private Residential Program Is Necessary To Provide A Handicapped Child With A Special Education, Federal Law Requires That State Educational Agencies Assume Financial Responsibility For The Placement.

B. Under Maryland Law, Local Education Bears Partial Financial Responsibility For Linda's Residential Placement If Such Placement Is A Necessary Component Of Her Educational Program.

the costs of maintaining a CINA in a private hospital,[6] notwithstanding that no funds have been budgeted or, more importantly, have been appropriated for that purpose by the legislature?

## II.

## — THE HOLDING —

Predicated on the doctrine of separation of powers, coupled with the legislative scheme for juvenile mental health services, we hold that the hearing court was without jurisdiction to direct DHMH to shoulder the financial responsibility for Linda's care and treatment at Taylor Manor. We further hold that *no* juvenile court has the authority to direct the Secretary of DHMH to pay the cost of treatment of a CINA in a private institution.

## III.

## — THE LAW —

A. *The Legislative Intent of Cts. & Jud. Proc. Article § 3-820.*

The judicial procedure for the adjudication and disposition of juveniles in need of health or mental hygiene care, or both,

---

V. UNDER ARTICLE VIII, SECTION 3 OF THE MARYLAND CONSTITUTION, THE BOARD OF EDUCATION MAY PROPERLY BE HELD RESPONSIBLE FOR PLACEMENT OF LINDA AT TAYLOR MANOR.

VI. WHERE LOCAL EDUCATION REPEATEDLY ABDICATES ITS RESPONSIBILITIES, PARENTAL ENROLLMENT OF THE CHILD AT TAYLOR MANOR DOES NOT CONSTITUTE AN ASSUMPTION OF FINANCIAL RESPONSIBILITIES FOR THE COSTS OF SUCH PLACEMENT.

VII. WHERE THE RESPONDENT IN JUVENILE PROCEEDINGS IS REPRESENTED BY A COURT-APPOINTED JUDICARE ATTORNEY, COUNSEL FEES SHOULD BE PAID BY THE JUDICARE PROGRAM AND NOT BY THE HEALTH DEPARTMENT."

**6.** Not raised by the parties nor decided by us is the sublingual question of whether a judge of the juvenile court, or any court for that matter, has the power to commit a person to a private hospital, *but see* Courts art. § 3-820 (b) (2).

is found in the Juvenile Causes Act, codified in Courts Art. § 3-801 through 3-834.

Juvenile court jurisdiction is triggered by the filing of a petition with the court by any interested party, in which petition the court is asked to adjudicate a child as 1) delinquent, 2) in need of supervision, or 3) assistance.[7] *Parojinog v. State,* 282 Md. 256, 384 A.2d 86 (1978). Thereafter, an adjudicatory hearing, unless waived, shall be held. Courts Art. § 3-819.

Once the allegations are proven, a separate disposition hearing must be held. Under the authority of Courts Art. § 3-820, the child may be committed to several alternative persons or agencies. Section 3-820 provides in pertinent part:

"(a) After an adjudicatory hearing the court shall hold a separate disposition hearing, unless the petition is dismissed or unless such hearing is waived in writing by all of the parties. The disposition hearing may be held on the same day as the adjudicatory hearing, if notice of the disposition hearing, as prescribed by the Maryland Rules, is waived on the record by all of the parties.

(b) The overriding consideration in making a disposition is a program of treatment, training, and rehabilitation best suited to the physical, mental, and moral welfare of the child consistent with the public interest. The court may:

(1) Place the child on probation or under supervision in his own home or in the

---

**7.** Section 3-804 (a) provides that "[t]he court [the circuit court of a county, the district court of Montgomery County or Baltimore City sitting as a juvenile court] has exclusive original jurisdiction over a child alleged to be delinquent, in need of supervision, or in need of assistance." The petitioning process is set forth in section 8-310. The section states: "Any person or agency having knowledge of facts which may cause a person to be subject to the jurisdiction of the court may file a complaint...."

Section 3-812 (a) instructs that the petition is to allege that "a child is either delinquent, or in need of assistance, or in need of supervision.... If it alleges that the child is in need of assistance ..., the petition shall set forth in clear and simple language the alleged facts supporting that allegation."

custody or under the guardianship of a relative or other fit person, upon terms the court deems appropriate;

(2) Commit the child to the custody or under the guardianship of the Juvenile Services Administration, a local department of social services, the Department of Health and Mental Hygiene, or a public or licensed private agency; or

(3) Order the child, parents, guardian, or custodian of the child to participate in rehabilitative services that are in the best interest of the child and the family." [8]

When a child is committed to the custody of DHMH, the statutory provisions governing DHMH, as well as those agencies embraced within the Department, are applicable. Designated in Md. Ann. Code art. 41, § 2A (1978 Repl. Vol., 1980 Cum. Supp.) as a "principal department of the executive branch" of the State government, the DHMH "is

---

8. Recently, the United States District Court of Maryland, in Johnson v. Solomon, 484 F. Supp. 278, 288 (D.C. Md. 1979), held that the commitment standards (or lack thereof) in section 3-820 (b) (to paraphrase, the best interests of the child) were unconstitutionally vague and "direct[ed] that standards be adopted which satisfy constitutional prerequisites." In apparent response to that judicial mandate, the Maryland Legislature, by Laws 1980, ch. 697, enacted the following amendments to section 3-820, effective July 1, 1980:

"(f) The court may not commit a child to the custody of the Department of Health and Mental Hygiene for inpatient care and treatment in a State mental hospital unless the court finds on the record based upon clear and convincing evidence that:

(1) The child has a mental disorder;
(2) The child needs inpatient medical care or treatment for the protection of himself or others;
(3) The child is unable or unwilling to be voluntarily admitted to such facility; and
(4) There is no less restrictive form of intervention available which is consistent with the child's condition and welfare."

The effect of the above amendment on the case at bar is nil. Also effective on July 1, 1980, was amended Md. Rule 915 (c) which was approved by the Maryland Court of Appeals in response to Johnson. Rule 915 (c) echoes the above amendment to section 3-820.

responsible for carrying out the Governor's policies in the areas of health and mental hygiene." Md. Ann. Code art. 41, § 206 (b). Section 206 (e) of Art. 41 enumerates those agencies that are included within the ambit of DHMH. Among those listed agencies are the State Department of Mental Hygiene and the State Department of Juvenile Services.

As a major department of the Executive Branch, section 206 (g) confers upon the Secretary of DHMH the responsibility for the budget of DHMH, while Maryland Constitution Art. III, § 52 (11) requires the Secretary to report to the Governor that amount of money needed to operate DHMH so that the Governor may include that sum or an adjusted amount within the budget he submits to the Legislature.[9]

The extent of a court's authority to commit a child to the care of the appellant can be ascertained from a review of the legislative scheme for the provision of juvenile mental health services in Maryland as well as a recent Court of Appeals' opinion closely analogous to the factual situation in the case at hand. In *In Re Appeal No. 653, September Term, 1975,* 277 Md. 212, 352 A.2d 845 (1976), a juvenile court had committed twelve children to the custody of DHMH. Each child had been adjudicated, pursuant to Md. Cts. and Jud. Proc. (1980 Repl. Vol.) Code Ann. § 3-820, a CINA. The court, in ordering DHMH to place the children in facilities separate from adults, reasoned that if section 3-823 prohibited the cohabitation of adults and juveniles in jails and other detention facilities, then the Legislature must have intended for them to be housed in separate mental facilities, notwithstanding that there was no express provision to that effect. DHMH was *not* a party to the adjudicatory proceeding, and it filed a motion to set aside or modify the juvenile court's order. Claiming that the court had exceeded its statutory authority, DHMH maintained that there were not enough State adolescent facilities to

---

**9.** For discussion on the Governor's role in preparation of the budget and the doctrine of the separation of powers *see* pp. 16 *et seq.*

accommodate the court's order, " 'rendering it impracticable and/or impossible for the Secretary [of DHMH] to comply with the orders.'" 277 Md. at 215, 352 A.2d at 847. Thereafter, a hearing was held to consider the DHMH's position, "at which several expert witnesses testified concerning the feasibility ... of separating adolescent patients from adult patients in mental health facilities. . . ." *Id.* The juvenile court was apparently unimpressed by DHMH's arguments inasmuch as it reiterated its original order.

Judge Eldridge, speaking for a unanimous Court, held that the legislature did *not* intend juveniles to be placed in mental health facilities separate from adults. The Court, in comparing the different subsections under section 3-820 (b) which enumerates the alternative persons or agencies to which a child may be committed, noted that subsection (b) (1) enables the juvenile court to "[p]lace the child on probation or under supervision in his own home or in the custody or under the guardianship of a relative or other fit person, *upon terms the court deems appropriate.*" (Emphasis in original.). Subsection (b) (2), which authorizes commitment to DHMH, does not, however, contain the phrase *"upon terms the court deems appropriate."* Thus, the Court of Appeals concluded that the legislature did not intend to authorize the juvenile courts "to specify whatever terms it deems appropriate [for commitment to DHMH]." 277 Md. at 217, 352 A.2d at 848. A juvenile court, it was held, could not order DHMH to place children in separate facilities from those of adults. *Id.*

*In re Appeal No. 653, supra,* is a clear instruction to this Court to hold that the Circuit Court for Prince George's County, sitting as a juvenile court, lacked the authority to order DHMH to pay for Linda's care at Taylor Manor. Section 3-820 (b) (2) empowers the court to commit a child to the custody of DHMH; it does not confer upon the court any right to mandate the specific terms of the commitment.

B. *Additional Evidence of Legislative Intent.*

The recurring theme permeating the pertinent statutory provisions concerning juvenile mental health services

referred to in Courts Art. § 3-820 (b) (2) is the broad discretion in implementing programs and expending appropriated funds.

We are mindful of a basic tenet of statutory construction, that a statute and other complementary provisions must be read as a whole in order to give effect to legislative intent. *State v. Fabritz*, 276 Md. 416, 348 A.2d 275, *cert. denied*, 425 U.S. 942 (1975).

Md. Ann. Code art. 43, which governs the general operations of DHMH, vests the Secretary with the *discretionary* authority, if the State budget so permits, to contract with outside doctors and hospitals should the Secretary believe that an *area* is substantially deficient in medical care. Md. Ann. Code art. 43, § 1F (h).

Section 1F (h) provides:

> "In the event of the failure of a cooperative effort by and between the Secretary and local community or voluntary organizations to establish medical or health care facilities ... or services for substantially deficient *areas,* to provide such facilities or services by way of contract with a doctor, groups of doctors, hospitals, or other authorized medical groups or personnel for the provision of necessary medical or health care facilities. Medical or health care facilities may be provided as authorized by the capital budgets of State or local governments." (Emphasis supplied.)

We think any fair reading of the above-quoted statute will disclose that in using the word *areas,* the Legislature meant *geographical areas* of the State wherein the medical or health services are deficient. The word *areas* does not mean, nor was it ever intended to be a synonym for, a branch of medical or mental health or hygiene or a specialized discipline thereof.

Section 1J (b) instructs the Secretary that he "*may* make grants from State . . . [appropriated] funds or enter into agreements for the use of such funds to assist public or

nonprofit organizations. . . ." (Emphasis supplied.) Turning to Article 52A — Juvenile Services —, section 7 provides that the

> "Department [of Juvenile Services] *may* designate existing public or private agencies or organizations within the State as its agents as, in its discretion, seems desirable or necessary for the purposes of this article. The Department *may* expend funds for aiding such agencies or organizations or for purchasing services therefrom. . . ." (Emphasis supplied.)

If such funds are not available, Art. 43, § 1F (e) permits the Secretary of DHMH to reassign funds from one department to another. Significantly, the General Assembly used the word *may* as opposed to *shall,* thereby strongly suggesting that the statutory instructions to the Secretary of DHMH are permissive, not mandatory. The use of *may* bestows a discretion in the Secretary. *See Resetar v. State Board of Education,* 284 Md. 537, 547, 399 A.2d 225, 230 (1979); *Maryland Medical Services, Inc. v. Carver,* 238 Md. 466, 480, 209 A.2d 582, 589-90 (1964). It is, therefore, within DHMH's discretion to expend appropriated funds, *cf.* Md. Education (1980 Cum. Supp.) Code Ann. § 8-409, especially purchase of care funds.[10] For the Court to interpret the statute so as to permit all juvenile courts [11] to direct the appellant to make payments in specified amounts to a specific private institution or person without regard to the appellant's budget would have disastrous effects on the State treasury.[12]

---

10. The record reveals that the appellee effectively argued that the appellant should have available purchase of care funds to expend upon Linda's care at Taylor Manor and if not, Md. Ann. Code art. 43, § 1F (e) enabled the Secretary of DHMH to reassign available funds from one department to another department which required such funds. During the March 1980 hearing, however, George Warner, an official in DHMH, testified that DHMH did not have purchase of care funds "in which they are able to support or continue a placement outside of one of their own facilities." That testimony was unrebutted.

11. There are, of course, 24 such courts, *i.e.,* one for each county and one for Baltimore City.

12. If each of the 24 juvenile courts were to place a CINA in a private hospital and then direct the Secretary of DHMH to pay from his funds the

Moreover, it would reduce the Secretary to the position of paymaster, with nothing more to do in such cases than to draw checks periodically and forward them to the court's designated recipient.

The indiscriminate expenditure of State funds for private placement at the instruction of courts will undermine the State budget, imperil the State's financial structure, and defeat the Legislature's intent to promote and provide mental health services with impartiality to all citizens of the State.

We adopt, with slight modification, the language of the New Jersey Superior Court in *State of New Jersey in the Interest of D.F., a Juvenile,* 145 N.J. Super. 381, 387-88, 367 A.2d 1198, 1201 (1976), *cert. denied,* 377 A.2d 665 (1977).

> "[DHMH] must act not only with respect to the needs of the particular juvenile concerned but also in light of the needs of the thousands of other juveniles equally needy and as limited by available resources. It cannot perform this function if its budget is to be affected by the orders of . . . [all] . . . Juvenile . . . court judges [in the State of Maryland] issued without respect to the realities of [DHMH's] fiscal problems."

*See In Re John Doe, a Juvenile,* 390 A.2d 390 (1978).

## C. *Separation of Powers*

An integral part of the Legislature's giving to the appellant the discretion to use appropriated funds is the doctrine of the separation of powers.[13] The doctrine is a

necessary fees, the effect on the DHMH budget would be catastrophic. In the instant case, the Taylor Manor charges are $3,100 per month, or $37,200 per year. If all 24 courts did the same thing, the charges paid by DHMH would escalate to $892,800 per year. Should each of the courts order more than one such commitment, the sum might well reach astronomical figures.

**13.** The Court of Appeals in In Re Appeal No. 653, *supra,* declined to discuss this constitutional principle. We find it necessary, however, if not compelling, to address the implications of the juvenile court's order on the interrelationship of the three branches of government — Executive, Legislative, and Judicial.

fundamental concept in the constitutional history of this State. *See Board of Supervisors of Election v. Todd,* 97 Md. 247, 54 A. 963 (1903).

> "[T]he Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other." [14] Md. Const. Declaration of Rights, Art. 8 (1977 Repl. Vol.).

The Court of Appeals, in *Wright v. Wright's Lessee,* 2 Md. 429, 56 Am. Dec. 723 (1852), early identified the purpose of Article 8. The Court stated that the doctrine's purpose

> "is to parcel out and separate the powers of government, and to confide particular classes of them to particular branches of the Supreme authority. That is to say, such of them as are judicial in their character to the judiciary; such as are legislative to the legislature and such as are executive in their nature to the executive."

While the nature of judicial versus non-judicial actions is not well defined, *see Todd, supra* at 264, 57 A. at 965, the constitution does not allow the courts to usurp the discretionary functions of the Executive, and the administrative departments of that branch, whose duties and powers have been properly delegated by the Legislature. *Department of Natural Resources v. Linchester Sand & Gravel Corp.,* 274 Md. 211, 228, 334 A.2d 514, 524 (1975).

The order of the juvenile court, directing DHMH to pay for Linda's private placement is a substantial encroachment

---

**14.** "The doctrine of the separation of powers," Mr. Justice Brandeis said in dissenting in Myers v. United States, 272 U.S. 52, 293, 47 S. Ct. 21, 85, 71 L. Ed. 160, 242 (1926), "was adopted . . . not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was, not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy." Mr. Justice Brandeis was speaking in *Myers* of the doctrine adopted by the Convention of 1787, relating to the Federal Constitution. His observations apply, with equal effect, to Maryland and its tri-departmental government.

upon the Executive's authority to propose the budget and upon DHMH, as an administrative department of the Executive, to use its discretion as granted by the Legislature to expend the appropriated funds.

The people of Maryland have elected a Governor who is the Chief Executive Officer of the State. They have charged him with the task of preparing the State budget and have also made him responsible for the State's fiscal policies.[15] The budget that the Governor submits to the Legislature for· approval and funding "contain[s] a complete plan of [the State's] proposed expenditures and estimated revenues." To fulfill his role of preparing the proposed budget, the Governor requires from "all executive departments ... applying for State moneys and appropriations, such itemized estimates and other information in such form and at such times as ... [the Governor] shall direct. . . ." [16] Subsection (4) of Art. III, § 52 of the State Constitution mandates that the budget submitted to the Legislature by the Governor "shall embrace an estimate of all appropriations ... (b) for the Executive Department ... [and] (g) for such other purposes as are set forth in the Constitution or laws of the State."

The historical development of the Executive's control over the preparation of the budget was discussed at length in *Maryland Action for Foster Children v. State*, 279 Md. 133, 367 A.2d 491 (1977). In that case, the facts were that the Legislature had passed a bill requiring that the Social Services Administration's payment rate to foster care homes be equalized to the payment rates of the Juvenile Services Administration. The budget submitted by the Governor did not include appropriations which would equalize the two rates. Consequently, the Maryland Action for Foster Children sued to compel the State to pay all foster care

---

**15.** Md. Constitution Article III, § 52 (3).

**16.** Md. Ann. Code art. 41, § 206 (g) (1978 Repl. Vol.) mandates that the Secretary of DHMH "be responsible for the budget of his office and for the budgets of the departments and other agencies within the jurisdiction of the Department of Health and Mental Hygiene." Obviously, the Secretary must obtain funding through the budget prepared and submitted by the Governor.

parents the equalized sum.[17] The Court held that the Governor was not under a mandatory duty to include within his proposed budget funding so as to comply with the legislation. Judge Eldridge, writing for the majority of the Court, emphasized the Executive's almost exclusive domain over the budget as submitted to the General Assembly. Judge Eldridge observed that prior to 1916, the Legislature had been responsible for the preparation of the budget. Excessive appropriations and a growing deficit prompted reformers to find an alternative method for budget preparation. A commission was appointed in 1915 for the purpose of recommending changes in the budgetary system. It recommended that the Executive be solely responsible for preparing the budget.[18] That recommendation gained fruition when a Constitutional amendment incorporating it was adopted by the electorate on November 7, 1916.[19] Nevertheless, the concept of the 1916 amendment remains basically intact. Although the Court of Appeals did not specifically address the separation of powers doctrine in the *Foster Children Case,* the Court pointed out that the preparation of the budget bill was completely within the discretion of the Governor, and any interference with his duty conflicted with the Maryland Constitution. The adoption by the voters of the amendment to the State Constitution Art. III, § 52 (11) and (12) placed a restriction on the Governor's theretofore absolute discretion. That restriction is not, however, applicable to this appeal, so we shall not dwell upon the subject.

Patently, no State program can operate without funds. The funds must be included in the Governor's budget and approved by the Legislature. Without that joint approval, no

17. The Legislature failed to pass a Supplementary Appropriations Bill which would have appropriated the additional funds needed to equalize the two rates. *See* Md. Const. art. III, § 52 (8).

18. *See* 28 Md. L. Rev. 395 (1968).

19. The amendment has undergone changes at the subsequent elections of November 2, 1948; November 4, 1952; November 6, 1956; November 3, 1964; November 8, 1966; November 3, 1970; November 7, 1972; November 5, 1974; and obviously in response to Md. Act. For Foster Children, Inc. v. State, *supra,* on November 7, 1978.

State funds may be expended by any department of the State government.

What the juvenile court order in the instant case did was to invade the Executive department by directing the Secretary of DHMH to pay out monies for a purpose not funded by the Legislature nor requested by the Executive. Furthermore, the court intruded on the Legislative Branch by directing the funding of Linda's private hospital confinement.

Thus, the juvenile court committed a "double play," by impinging upon the powers of the Executive and the Legislative Branches. The "double play," however, is a "double error." The order directing the infringement is null and void inasmuch as the court was without the authority to enter it.

> *The order of the Circuit Court for Prince George's County (sitting as a Juvenile Court) is reversed. Costs to be paid by appellees.*