695 A.2d 211

## DEPARTMENT OF HEALTH AND MENTAL HYGIENE

v.

## William DILLMAN.

### No. 363, Sept. Term, 1996.

Court of Special Appeals of Maryland.

June 20, 1997.

Thomas W. Keech, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for Appellant.

Walter D. McQuie, Cambridge, for Appellee.

Argued before MURPHY, C.J., and DAVIS and EYLER, JJ.

DAVIS, Judge.

On October 24, 1995, an administrative law judge (ALJ) determined that appellant William Dillman met the statutory criteria for admission to a State residential center and certified his admission. Dillman appealed to the Circuit Court for Baltimore City, and on October 31, 1995, the court reversed the decision of the ALJ. The Department of Health and Mental Hygiene (DHMH or Department) appeals from the lower court's decision and presents two questions for our review, which are restated below:

I.  Is private residential placement "available," within the meaning of MD.CODE (1994 REPL.VOL., 1996 SUPP.), § 7-503(e)(1)(iii) of the HEALTH-GEN. ART. (H.G.), when a private contractor proposes to create such a placement,

but the State has exhausted funds allocated for such a placement and has not agreed to fund the proposal?

II. Did the trial court violate the standard of review for an administrative decision under MD.CODE (1995 REPL.VOL., 1996 SUPP.), § 10–222 of the STATE GOV'T ART. (S.G.) by not accepting the ALJ's finding that a proposed private residential placement was not "less restrictive" than placement at a State residential center?

## FACTS

William Dillman is fifty-three years old and diagnosed with moderate mental retardation and paranoid personality disorder with anti-social traits. Dillman was admitted to Rosewood Center (Rosewood), a State residential center for individuals with developmental disabilities, on March 9, 1978. Dillman was admitted to Rosewood from the Prince George's County Detention Center where he was incarcerated for a criminal offense which occurred in June 1977. Subsequently, the criminal charges were dropped, and in May 1979, Dillman was placed in the community under the supervision of the Baltimore Association for Retarded Citizens (BARC). On April 10, 1980, Dillman was returned to Rosewood by Order of the Circuit Court for Baltimore City because of an alleged criminal offense which occurred in March 1980.

On May 9, 1992, Dillman was placed in another community residential placement program under the direction of Jesse Grim. On September 17, 1992, Dillman was arrested and charged with second and fourth degree sex offenses. As a result, Dillman was returned to Rosewood. The District Court of Maryland for Baltimore City found Dillman incompetent to stand trial and committed him to Rosewood pursuant to H.G. § 12–105(b).[1] The criminal charges were dismissed on July 25, 1994.

---

1. H.G. § 12–105(b) provides that "[i]f, after a hearing, the court finds that the defendant is incompetent to stand trial and, because of mental retardation or a mental disorder, is a danger to self or person or property of another, the court may order the defendant committed to

On October 24, 1994, a hearing was held, pursuant to H.G. § 7–503(a), to determine whether Dillman met the criteria for continued confinement at Rosewood. The ALJ made several findings of fact including that the Rosewood treatment team consistently stated that Dillman requires residential services to maintain and acquire life skills. The findings also stated that Dillman "is independent in areas of domestic tasks and self care, is self aware and expresses appropriate emotional responses." Dillman, accompanied by a Rosewood staff member, is employed by BARC three to five days a week planting bulbs and shrubs and cutting grass. The ALJ found that Dillman requires assistance with budgeting and does not fully understand the value of money. The treatment team at Rosewood noted that Dillman "functions best in a highly structured environment where routines are clearly outlined." The ALJ also found that the intervention team's annual report, among other recommendations, stated that Dillman should receive twenty-four-hour close supervision, line-of-sight supervision when in the community, and a staff trained in the management of disruptive behavior.

In September 1993, interdisciplinary and forensic teams at Rosewood recommended that Dillman be released to Other Options Inc., a community based residential placement program. The team noted that "[w]hen Mr. Dillman has a structured program and appropriate supervision, he presents little to no problems....". Other Options Inc. is prepared to provide services to Dillman if funding is approved. In addition, Joseph Matthew from The Center for Social Change, another residential community based program, met with Dillman and stated that The Center for Social Change is prepared to place Dillman in community placement with services recommended by the team if funding is provided.

---

the facility that the Department designates until the court is satisfied that the defendant no longer is incompetent to stand trial or no longer is, because of mental retardation or a mental disorder, a danger to self or the person or property of others."

In 1994, the Developmental Disabilities Administration (DDA)[2] was allocated funds for the institutional downsizing of Rosewood by providing individuals with needed services in community placements. The funding allowed for community placement of ten individuals for 1994. Dillman was not included among those ten individuals and there are no funds from that budget allocation for additional placements. The DDA Central Maryland Regional Office was also allocated approximately two million dollars for placement of clients in the community to avoid admission into an institution. These funds, however, are only for persons brought to Rosewood as a temporary option while DDA arranges community placement. DDA does not consider Dillman a community client. There are funds currently available in the budget for these emergency placements, but, as the ALJ concluded, it is within the discretion of the DDA whether to use these funds for community placement.

On March 14, 1995, the ALJ certified Dillman's admission to Rosewood. The ALJ concluded that Dillman was mentally retarded within the meaning of H.G. § 7–503(e)(1)(i) and needed residential care and treatment within the meaning of H.G. § 7–503(e)(1)(ii). The ALJ also concluded that there was no less restrictive setting in which Dillman's needs could be met that was available pursuant to H.G. § 7–503(e)(1)(iii) because there were no available funds for Dillman's private placement. The ALJ stated "the fact that Other Options and the Center for Social Change are willing to accept the Appellant, does not make the placements available." In addition, the ALJ concluded that Dillman would receive the same services in the community programs that he would receive at Rosewood, and thus community placement was not "less restrictive." Dillman appealed from the ALJ's order to the Circuit Court for Baltimore City.

The court found that the DDA did not show by clear and convincing evidence that there was not a less restrictive

---

2. DHMH is the named party of this action; however, DDA is the agency within DHMH that directly administers the statute in question.

setting in which the needed services could be provided that was available pursuant to H.G. §§ 7–503(e)(1)(iii). The court held that "a lack of funding is an inappropriate measure of availability for community placement." The court stated the legislative intent of H.G. §§ 7–502 and 7–503 is "not to deprive individuals of their constitutional right to liberty by placing individuals with developmental disabilities in a restrictive setting." With regard to a "less restrictive placement," the court found that DDA relied solely on its financial ability and did not "adequately argue that there was no less restrictive setting in which to place appellant." On October 31, 1995, the court, finding error of law and that DDA had not shown by clear and convincing evidence that no less restrictive setting was available, reversed the decision of the ALJ.

## DISCUSSION

According to H.G. § 7–503(e)(1)(iii), in order to certify Dillman for admission to a State residential center, DHMH must show by clear and convincing evidence that there is "no less restrictive setting in which the needed services can be provided that is available to the individual or will be available to the individual within a reasonable time after the hearing." [3] Thus, in order to not certify an individual to a State residential center, the ALJ must find that both an individual's needs can be met in a less restrictive setting, and that a less restrictive setting is available. We address each criteria below.

I

"Judicial review of agency fact[-]finding is narrow in scope and requires the exercise of a restrained and disciplined judicial judgment." *Liberty Nursing Ctr., Inc. v. Dep't of*

---

**3.** "Reasonable time means a period after a hearing in which an appropriate program or service shall be made available to an individual in order to avoid admission to a State residential center. This period of time may not exceed 90 days unless there is a program or service which is identified as available to the individual and which will accept the individual for services to begin on a fixed date." COMAR 10.22.01.02(5).

*Health & Mental Hygiene,* 330 Md. 433, 442, 624 A.2d 941 (1993). When the agency's findings are supported by substantial evidence, "in the form either of direct proof or permissible inference, in the record before the agency, an appellate court may not substitute its judgment, even on the question of the appropriate inference to be drawn from the evidence, for that of the agency." *Id.* at 443, 624 A.2d 941. When, however, the decision of the ALJ involves a question of law, ordinarily no deference is appropriate and the reviewing court may substitute its judgment for the agency's decision. *Id.* In the case at bar, the first issue raised by appellant, the interpretation of "available" within the meaning of H.G. § 7–503(e)(1)(iii), is an issue of law which we review *de novo.*

■ The Department argues that a less restrictive placement is not "available" if the price of the placement is unknown and there are no funds allocated to pay for the placement. H.G. § 7–502(b) prohibits the Secretary of DHMH from admitting an individual to a State residential center if there is a less restrictive setting available in which the needed services can be provided. H.G. § 7–503 provides that, within twenty-one days after admission of an individual to a State residential center, an ALJ shall conduct a hearing using the criteria set out in H.G. § 7–503(e)(1)(iii). H.G. § 7–503(e)(1) provides:

*Findings supporting admission.*—(1) At the hearing, in order to certify the admission of the individual, it must be affirmatively shown by clear and convincing evidence that the conclusions leading to the decision to admit the individual are supported by the following findings:

(i) The individual has mental retardation;

(ii) The individual needs residential services for the individual's adequate habilitation; and

(iii) There is no less restrictive setting in which the needed services can be provided that is available to the individual or will be available to the individual within a reasonable time after the hearing.

H.G. § 7–503(e)(1). Neither the statute nor the regulations define the term "available"; thus, to determine the legislature's intended meaning we must ascertain the legislative purpose of the statute. *Motor Vehicle Admin. v. Shrader,* 324 Md. 454, 462, 597 A.2d 939 (1991). To interpret the purpose of H.G. § 7–503(e)(1)(iii) we look to the plain language of this section and the intent of the Maryland General Assembly in promulgating H.G. § 7–503(e)(1) in the context of the overall statutory scheme of Title 7 of the Health–General Article. *Motor Vehicle Admin.,* 324 Md. at 463, 597 A.2d 939 ("[t]he legislative intent must be gleaned from the entire statute, rather than from only one part.").

The legislative policy of Title 7 is set forth in H.G. § 7–102 which provides, in part:

(1) To promote, protect, and preserve the human dignity, constitutional rights and liberties, social well-being, and general welfare of individuals with developmental disability in this State;

(2) To encourage the full development of the ability and potential of each individual with developmental disability in this State, no matter how severe the individual's disability;

(3) To promote the economic security, standard of living, and meaningful employment of individuals with developmental disability;

(4) To foster the integration of individuals with developmental disability into the ordinary life of the communities where these individuals live;

(5) To support and provide resources to operate community services to sustain individuals with developmental disability in the community, rather than in institutions;

(6) To require the administration to designate sufficient resources to foster and strengthen a permanent comprehensive system of community programming for individuals with developmental disability as an alternative to institutional care;

(7) To recognize the right of those individuals with developmental disability who need residential services to live in surroundings as normal as possible and to provide adequate facilities for this purpose;

(8) To provide appropriate social and protective services for those individuals with developmental disability who are unable to manage their own affairs with ordinary prudence.

H.G. § 7–102. Title 7 must be construed in a manner consistent with this policy to encourage the integration of developmentally disabled individuals into community life and designate support and resources for community programs. H.G. § 7–103.

■ After examining the policy and statutory scheme of Title 7, we hold that the term "available" within H.G. § 7–503(e)(1)(iii) means practically and actually available. That reading necessarily includes a financial or budgetary component and is consistent with the plain language of H.G. § 7–503(e) and with the overall statutory scheme of Title 7.

In this case it is undisputed that appellee has mental retardation and requires residential services for adequate habilitation. H.G. § 7–503(e) focuses on the admission of an individual to a State residential center and the criteria that must be established in order for an ALJ to certify an individual for admission. The ALJ must decide (a) whether the services can be provided in a less restrictive setting *and* (b) whether that setting is available to appellee.

We disagree with the trial court's conclusion that determining whether a less restrictive setting is available does not include financial considerations. If we were to prohibit the ALJ and DDA from considering the availability of funding to pay for such a setting, we would be reducing the inquiry to a single part. If the ALJ could not consider financial factors when determining if a less restrictive setting is "available," DDA would be unable to admit or retain an individual in a State residential facility as long as a private contractor is willing to provide the residential services needed without regard to cost. If there is no limit to the amount of money

that a private contractor can charge for its services, it is difficult to conceive of a situation in which an individual could be admitted or retained in a State facility.

*Department of Health & Mental Hygiene v. Prince George's Co. Department of Social Services,* 47 Md.App. 436, 423 A.2d 589 (1980) and *In Re Demetrius J.,* 321 Md. 468, 583 A.2d 258 (1991), support our interpretation of H.G. § 7-503(e)(1)(iii). In *Dep't of Health,* the trial court ordered that DHMH expend State funds for the private placement of a child adjudicated as a child in need of assistance (CINA). *Dep't of Health & Mental Hygiene,* 47 Md.App. at 438, 423 A.2d 589. On appeal, we held that, if the courts are permitted to instruct DHMH in this way, the State budget and financial structure will be undermined as well as the "legislative intent to promote and provide mental health services with impartiality to all citizens of the State." *Id.* at 448, 423 A.2d 589. Similarly, in *Demetrius,* the Court considered the governmental obligations in juvenile cases between the Judiciary and the Executive Departments. *In Re Demetrius J.,* 321 Md. at 474, 583 A.2d 258. The Court held that, if it is proven that a child has committed a delinquent act, the court may commit the child to the custody of the Department of Juvenile Services (DJS), and may designate the type of facility where the child is to be accommodated. *Id.* at 475, 583 A.2d 258. The court, however, may not designate a specific facility; such designation is the prerogative of the DJS. *Id.* The Court went on to explain that it would not be possible for DJS to fulfill its functions if it could not control the appropriated funds. *Id.* at 474–75, 583 A.2d 258.

Appellee attempts to distinguish the instant case from *Dep't of Health & Mental Hygiene* and *In Re Demetrius J.* by stating that the effect of the court's decision in the instant case is not for the ALJ to instruct DDA to place appellee in any particular facility, but merely to determine that appellee cannot be retained in a State residential facility. In other words, if DDA determines that the less restrictive setting is not within its budgetary authority, DDA has the choice of

releasing appellee from the State facility.[4]  Appellee fails to appreciate that the choice he leaves DDA is a Hobson's choice, particularly in this case.

With the exception of three short periods of time, appellee has resided at Rosewood since 1978.  During each of these short releases from Rosewood, he was implicated in incidents of sexual misconduct, including criminal charges of sodomy with a four-year-old child.  While the record is unclear regarding the details of the disposition of appellee's criminal charges, *all of the witnesses, including his own witnesses, agree that he requires twenty-four hour one-on-one supervision, including awake at night supervision in order not to pose a danger to others.*  The legislature did not intend to leave DDA with the choice of exceeding its budgetary authority or releasing such an individual, unassisted, into society.  Indeed, a review of the other sections of Title 7 convinces us that this is so.

H.G. § 7–505 provides for the annual reevaluation of each individual with mental retardation who is admitted to a State residential center.  If, upon reevaluation, the Secretary finds that an individual no longer meets the admission requirements, the Secretary must begin appropriate proceedings for the release or transfer of that individual.  If the ALJ is not

---

4.  DDA has authority pursuant to H.G. § 7–403 and the regulations provided in accordance with § 7–401 to determine an individual's eligibility for and access to community services.  *See* COMAR 10.21 and 10.22.  DDA has discretion pursuant to H.G. § 7–404 to determine when eligible individuals will receive DDA funded services.  Individuals must apply for services provided by DDA, and when an individual is eligible for a particular service, the DDA under H.G. § 7–404(c) determines "in accordance with the rules and regulations adopted under § 7–401(a)(2) and (3) of this subtitle the nature, extent, and timing of the services to be provided to individuals."  The regulations apply to any services provided in community programs, but expressly state that they do not apply to State residential centers.  COMAR 10.22.18.03.  An individual may be eligible for services provided by DDA if he or she is a resident of Maryland and has an evaluation finding that he or she is developmentally disabled.  COMAR 10.22.18.05.  The regulations also provide criteria for determining the priority of services for those individuals found to be eligible for a particular service.  COMAR 10.22.18.07.

permitted to take financial considerations into account, DDA will be required, upon annual reevaluation, to release or transfer each individual who comes forward with a private contractor who is willing to provide residential services within a less restrictive setting. DDA has a set budget for downsizing that cannot possibly accommodate wholesale transfers of individuals from State facilities. Indeed, appellee could not be accommodated through DDA's downsizing budget. Accordingly, if such financial constraints are not taken into account, DDA may potentially be required to release individuals, unassisted, who may then pose a danger to themselves or others.

Further, an individual may petition for release at any time, and is entitled to a jury trial on his petition. H.G. § 7–507. In considering whether an individual should be released, the trier of fact must consider all of the admission requirements once again, including "[w]hether there is a less restrictive setting in which the needed services can be provided that is available to the individual or will be available to the individual within a reasonable time." By permitting the ALJ to consider financial factors, DDA will not be forced to release or transfer individuals upon a showing that residential services can be provided in a less restrictive setting without regard to cost.

The legislative policy set forth in H.G. § 7–102 must be construed to promote and preserve the human dignity, constitutional rights and liberties, social well being, and general welfare of individuals with developmental disability, and to encourage the integration of the developmentally disabled into community life. The developmentally disabled are done a disservice when government directs that they be released unassisted into a society in which they are unprepared to live. Implicit in the legislature's policy is the encouragement of *successful* integration of the developmentally disabled.

Therefore, the legislature intended the term "available" within the meaning of H.G. § 7–503(e)(1)(iii) and Title 7 to require a showing by clear and convincing evidence that an individual's needs cannot be met in a less restrictive setting that is practically and actually available. This interpretation

necessarily permits the ALJ to take financial considerations into account. In the instant case, the ALJ determined that no funds existed for appellee's community placement, and therefore, such placement was not "available" within the meaning of H.G. § 7–503(e)(1)(iii). We agree with the ALJ's decision and reverse the trial court's judgment.

## II

■ We now turn to appellant's argument that the trial court violated the standard of review for an administrative decision under S.G. § 10–222 by not accepting the ALJ's finding that a proposed private residential placement was not "less restrictive" than placement at a State residential center. We hold that the trial court did not err because the ALJ did not make any findings with regard to whether there was a less restrictive setting in which Dillman could receive the services he needed.

■ "Judicial review of administrative action differs from appellate review of a trial court judgment." *United Steelworkers of America, Local 2610 v. Bethlehem Steel Corp.*, 298 Md. 665, 679, 472 A.2d 62 (1984). When an appellate court reviews the decision of a trial court it may affirm the judgment if there is any evidence in the record to support the lower court's judgment even if the reason was not relied on by the trial court. *Id.* On judicial review of an agency decision, however, the Court "may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated by the agency." *Id.* Although we agree with the trial court's conclusion that the ALJ never reached the issue of whether the alternative *settings* were less restrictive than Rosewood, we believe that there was sufficient evidence upon which the ALJ could have made that finding.[5]

---

5. In this case, the record demonstrated that appellee was permitted to work, supervised, outside Rosewood two to four days a week at landscaping, a job which he enjoyed. He was given assistance budgeting his money. He was permitted, with a chaperon, to go on dates, to go out to dinner and see movies. Appellee testified that he has his own

The ALJ in the instant case stated that "the record established the Appellant [Dillman] received services recommended by his treating professionals such as budgeting, recreational opportunities and employment and would continue to receive those same services, maintain the same employment and be subject to the same level of supervision while in the community, as at Rosewood." The ALJ concluded that the treatment team recommended the same services in the community as were being provided at the State residential center, and "there was no evidence those services are professionally unacceptable."

The ALJ, however, failed to make any findings as to whether the *setting* was less restrictive in the community placement than in the State residential center. Instead, the ALJ focused on the degree of services and stated that the services would be the same in both facilities. According to H.G. § 7–503(e)(1)(iii), the ALJ must determine whether it is possible for Dillman to receive the services recommended by the DDA in a setting that is less restrictive than a State residential center. There, however, is no need to remand the case on this issue because we reverse the circuit court's decision on the interpretation of the term "available" within H.G. § 7–503(e)(1)(iii) and agree with the ALJ's finding that the proposed private placement is not "available." Thus, the alternative ground relied on by the ALJ, that there was not a "less restrictive setting," is not dispositive of the issue presented to us on appeal. We reverse the circuit court's decision and thereby affirm the ALJ's decision.

■ Finally, DHMH filed a Motion To Strike Part Of Appellee's Brief And Appendix which cites and reprints an unreported opinion of the Circuit Court for Allegany County as persuasive authority. Opinions of the lower courts are not

room and his own phone at Rosewood. Appellee's witnesses testified that they would attempt to secure housing in a remote area for the safety of the community. The implication was that they would choose housing which would limit his contact with neighbors. In addition, the contractors agreed that appellee would be closely supervised at all times, twenty-four hours a day.

binding on the Court of Appeals or this Court, and thus, we do not regard the circuit court opinion cited in Dillman's brief as persuasive authority. *Cf.* MD. RULE 8–114(a) (1996) ("an unreported opinion of the Court of Appeals or Court of Special Appeals is neither precedent within the rule of *stare decisis* nor persuasive authority"). We therefore grant DHMH's motion to strike that portion of appellee's brief and appendix which cites the opinion of a circuit court.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED.**

**COSTS TO BE PAID BY APPELLEE.**