<u>In re: Adoption/Guardianship of Dustin R.</u>, No. 24, September Term, 2015

**APPEALABILITY – INTERLOCUTORY ORDER – JURISDICTION – STATUTORY AUTHORITY – MD. CODE ANN., FAM. LAW (1984, 2012 REPL. VOL.) § 5-328(a) – MD. CODE ANN., FAM. LAW (1984, 2012 REPL. VOL.) § 5-324(b)(1)(ii)(7)(B) – MD. CODE ANN., FAM. LAW (1984, 2012 REPL. VOL.) § 5-324(b)(1)(ii)(8) – SEPARATION OF POWERS – ARTICLE 8 OF MARYLAND DECLARATION OF RIGHTS –** Court of Appeals held that: (I) Court of Special Appeals erred in dismissing Department of Health and Mental Hygiene ("DHMH")'s appeal because Circuit Court for Anne Arundel County, sitting as a juvenile court ("juvenile court")'s order was immediately appealable at a minimum as interlocutory order granting injunctive relief; (II) juvenile court had jurisdiction and statutory authority to order DHMH to develop and approve written plan of clinically appropriate services in the least restrictive setting that ensured that child with disabilities would continue to receive services, where child was not yet twenty-one years old when juvenile court issued order and where such services were required to protect child's health and welfare, and where juvenile court's order served to bridge gap in services as child transitioned from juvenile guardianship care to adult guardianship care and whatever final outcome (including judicial review) may be of any Medicaid fair hearing proceedings; and (III) juvenile court did not violate separation of powers.

IN THE COURT OF APPEALS

OF MARYLAND

No. 24

September Term, 2015

_____

IN RE: ADOPTION/GUARDIANSHIP OF
DUSTIN R.

_____

Barbera, C.J.
Battaglia
Greene
Adkins
McDonald
Watts
Harrell, Jr., Glenn T. (Retired,
Specially Assigned),

JJ.

_____

Opinion by Watts, J.

_____

Filed: December 21, 2015

This case concerns whether the Court of Special Appeals erred in dismissing on its own initiative an appeal by the Department of Health and Mental Hygiene ("DHMH"), Respondent, and whether the Circuit Court for Anne Arundel County, sitting as a juvenile court ("the juvenile court"), had the authority to order DHMH to continue to provide services after age twenty-one to Dustin R. ("Dustin"), Petitioner, a medically fragile child who needed life-sustaining care.

We hold that: (I) the Court of Special Appeals erred in dismissing DHMH's appeal because the juvenile court's order was immediately appealable at a minimum as an interlocutory order granting injunctive relief; (II) the juvenile court had jurisdiction and the statutory authority to order DHMH to develop and approve a written plan of clinically appropriate services in the least restrictive setting that ensured that Dustin would continue to receive services, where Dustin was not yet twenty-one years old when the juvenile court issued its order and where such services were required to protect Dustin's health and welfare, and where the juvenile court's order served to bridge the gap in services as Dustin transitioned from his juvenile guardianship case to adult guardianship care and whatever the final outcome (including judicial review) may be of any Medicaid fair hearing proceedings; and (III) the juvenile court did not violate the separation of powers.

## BACKGROUND

On December 16, 1992, Dustin was born. In February 1995, when he was two years old, Dustin entered foster care. In that year, the juvenile court terminated Dustin's biological parents' parental rights and granted guardianship to the Anne Arundel County Department of Social Services ("DSS") with the right to consent to adoption or long-term

care short of adoption. On March 28, 1995, DSS placed Dustin in a treatment foster care home with Jacqueline and Darrell P. ("Mrs. P." and "Mr. P.," respectively).[1] Dustin's placement with Mr. and Mrs. P. was successful; Mr. and Mrs. P.'s home was designated by court order as Dustin's permanent placement; and the juvenile court gave Mr. and Mrs. P. limited guardianship authority to make medical (including mental and dental health), educational, and out-of-State travel decisions on Dustin's behalf. Dustin has lived with Mr. and Mrs. P. since March 28, 1995.

There is no dispute that Dustin is medically fragile and has special needs. Dustin has, among other conditions, an intellectual disability, severe seizure disorder, cortical visual impairment, gastro-esophageal reflux, scoliosis, osteoporosis, ischemic encephalopathy, global orthopedic impairments, cerebral palsy, and an Unidentified Long Chain Fatty Acid Syndrome with a Mitochondrial Disease (a metabolic disorder).[2] Dustin has a tracheostomy, full glottal closure,[3] a colostomy, and a gastrostomy tube for feeding. DHMH administers the Maryland Medical Assistance Program ("Medicaid"), which has

---

[1] In certain parts of the record, Mrs. P. is referred to as "Jackie."

[2] Dustin's doctor testified that "[a] mitochondrial abnormality is a large group of disorders" and that "the mitochondrion . . . is th[e] part of the cell that . . . convert[s] food into energy" and regulates the body's equilibrium. In a nursing care plan for Dustin, the notes section states that, as a result of this condition, "Dustin has limited ability to metabolize long chain fatty acids[.]"

[3] The "glottis" is "the opening between the vocal cords in [the] throat." Glottis, Merriam-Webster (2015), http://www.merriam-webster.com/dictionary/glottis [http://perma.cc/LC9Z-HAE7]. According to Dustin's doctor, as a result of the full glottal closure, or full epiglottal closure, in which Dustin's "vocal chords are basically closed off[,]" Dustin has a "very difficult" time making sound and needs "to generate a fair amount of force to be heard because he has no vocal chords."

paid Dustin's medical expenses in foster care.

As Dustin grew older, his condition worsened. On February 18, 2005, when Dustin was twelve years old, after an emergency hearing, the juvenile court ordered DSS to secure round-the-clock (twenty-four hours per day, seven days per week) nursing services for Dustin.[4] In response, DSS filed an emergency motion requesting to remove Dustin from the home of Mr. and Mrs. P. and to move him to another placement that would cost "substantially less[,]" as the cost of round-the-clock nursing services exceeded the Medicaid rates. Ultimately, DSS reached an agreement to provide the additional private nursing care to Dustin by supplementing the Medicaid rates through splitting the cost of the supplemental payments between the Developmental Disabilities Administration ("DDA") (which DHMH administers) and the Department of Human Resources. In 2006, DSS contracted with MedSource Community Services, Inc. ("MedSource") to provide round-the-clock nursing services at an hourly rate that exceeded the Medicaid reimbursement rate. Since that time, Dustin has had a rotating team of eight registered nurses providing round-the-clock services.

As early as 2010, Dustin began to seek the provision of services for himself after age twenty-one. In March 2010, at age seventeen, Dustin filed a petition for co-commitment to DHMH and DSS. The juvenile court denied the petition without prejudice. In June 2011, Dustin filed an amended petition for co-commitment to DHMH and DSS, requesting that the juvenile court require DHMH and DSS to "present a written plan to

---

[4]According to Mrs. P., when Dustin was younger, his health was "much less complicated" and he required only eight hours of nursing per day.

provide for the care of Dustin [] in the [] home [of Mr. and Mrs. P.], including 24 hour skilled nursing care, upon turning" twenty-one years old.  Dustin described his medical condition at that time in the amended petition as follows:

[] Dustin, now 18 ½ years old, is a severely medically fragile child with special needs.  He is diagnosed with Unidentified Long Chain Fatty Acid Syndrome with a Mitochondrial Disease (metabolic disorder), Mental Retardation, Severe Seizure Disorder, Gastro-Esophageal Reflux, Cortical Visual Impairment, Scoliosis, Osteoporosis, Global Orthopedic Impairments, and Cerebral Palsy.  Because Dustin has limited ability to metabolize long chain fatty acids, has severe protein allergies, and frequent dramatic fluctuations in his blood sugar levels, he is fed a reduced protein formula and must be assessed a minimum of every 4 hours to prevent a metabolic crisis which may impact multiple body systems.  He has a gastrostomy tube[,] as well as an intravenous port for antibiotic administration and blood sample draws.  [On] March 8, 2011[,] his rectum was permanently[,] surgically closed[,] and the surgeons created a permanent colostomy.  He has fragile skin with a history of pressure ulcers, a history of gastrointestinal bleeding, and urinary retention with a history of bladder infections.  At the time of this [amended] petition, he has been diagnosed with Neutropenia, a condition that compromises the body's ability to heal or fight infection due to an extremely low white blood cell count.  This condition further complicates the metabolic disorder.

[] He functions at the cognitive level of about a [six-]month[-]old.  He does not have the ability to control his movement[,] and is transferred throughout the day from bed to wheelchair to standing frame frequently.  In each piece of equipment, he is repositioned frequently[,] with multiple soft pads to prevent pressure sores and to stimulate long bone growth.  He can[]not make sound[,] so he must be within sight of the nurse at all times.  He receives all nutrition and most of his medication through a gastrostomy tube into his stomach and receives all intravenous medications and nutrition through the surgically implanted BardPort that provides direct access to the heart through the Vena Cava.  He has doctor's orders to receive 16 medications at specified times every day[,] and receives 5 additional medications on a "prn[,]" or as needed[,] basis.  He receives oxygen through [a] tube in his trachea when his blood oxygen saturation is low.  Because he can[]not swallow or clear his airway, he is suctioned through the trachea tube when necessary, as determined by the nurse, to prevent aspiration of fluid into his lungs.  He is also catheterized for urine every four hours and more frequently if he has an infection.

(Record references omitted). Eventually, in April 2013, DHMH consented to co-commitment, and the juvenile court ordered DHMH to "continue the planning process for the transition of [Dustin] from foster care under the guardianship of [DSS] to the guardianship of his current foster parents or other appropriate persons[.]" Significantly, between March 2010—when Dustin first filed a petition for co-commitment to DHMH and DSS—and August 2013, on multiple occasions, Dustin requested that the juvenile court order DHMH to fund and provide to him after his twenty-first birthday the same services that he was then receiving. DHMH consistently opposed those requests on the grounds that such requests exceeded the juvenile court's authority.

In Fall 2012, DHMH and DSS began planning for Dustin's transition out of his juvenile guardianship and foster care. On December 6, 2012, representatives of DHMH participated in a quarterly Treatment Team Meeting that DSS organized. A DDA representative, who was at the meeting to help plan for Dustin's transition from foster care, stated that DDA was committed to working with Medicaid's Rare and Expensive Case Management Program ("REM") "to determine the recommended level of services." The DDA representative agreed to follow up with a DDA nurse to complete an assessment of Dustin in coordination with REM before the next scheduled Treatment Team Meeting. On February 7, 2013, a DDA nurse assessed Dustin and observed that Dustin "has an extensive medical history with treatment needs that are not deleg[]able to unlicensed staff[,]" but the DDA nurse opined that "the licensed nursing service is able to be shared" because Dustin was "not receiving treatments at intervals that would disallow for shared service with

- 5 -

another person of equal or lesser licensed nursing need." On March 4, 2013, Dustin's resource coordinator recommended a service change, in which she noted that the outcome desired was as follows: "Dustin will be provided his current supports in order to continue living in his current residence when he turns 21." The resource coordinator stated that, "for Dustin to continue living in his current residence, all funding [that] he is currently receiving needs to continue, with the budget being through [DDA] at the time that he turns [twenty-one] years old."

On March 7, 2013, DSS conducted a Treatment Team Meeting, which representatives of DHMH, Dustin's resource coordinator, Mrs. P, and Dustin's counsel attended. The notes from the meeting state that the group was "in the process of planning for Dustin's transition to DDA when he turns [twenty-one years old] in December." The notes from the meeting state that a request for service change had already been submitted to DDA, and that DDA was to respond by March 29, 2013. During the meeting, Mrs. P. expressed her concern "for Dustin to continue with the current quality of nursing services[,]" which she believed to be "essential . . . for Dustin to remain in the [P. family] home after he turns" twenty-one years old. The notes from the meeting indicate that "[t]here continue[d] to be disagreement about the rate of nursing care[,]" and reported DDA's intent to distribute a plan for Dustin for care in the P. family home "[i]n the next 3 to 4 months," and the need for an "alternative plan" if Mrs. P. was not comfortable with the plan for nursing care in the P. family home.

In a letter dated June 5, 2013—after DHMH consented to co-commitment—DDA proposed a transition plan for Dustin. DDA stated that Dustin would remain eligible to

participate in REM; that Medicaid would pay for Dustin's medical care; and that Dustin would be eligible for a DDA waiver,[5] whether or not he remained in the home of Mr. and Mrs. P. DDA stated that it would seek to move Dustin to a residential program if Mr. and Mrs. P. decided not to seek guardianship.

Mr. and Mrs. P. decided to seek guardianship of Dustin so that he could remain in their home; on July 26, 2013, Mr. and Mrs. P. submitted through Dustin's resource coordinator a proposed service funding plan, in which they, in coordination with MedSource, proposed to "[c]ontinu[e] Dustin's budget 'as is[.]'" The budget for Dustin's care would continue to cover items such as training and orientation for Dustin's nursing team, case management, payment of non-covered medical supplies and prescriptions, partial payment of utilities within the home of Mr. and Mrs. P., and equipment maintenance. In a letter dated August 14, 2013, DHMH responded to the proposed service funding plan, stating that certain services provided to Dustin were "covered waiver services[,]" including Dustin's nursing, medical equipment and supplies, medications, and other medical care, but that other services requested in the proposed service funding plan were not covered, and thus were denied.[6]

On August 26 and 27, 2013, and September 27, 2013, the juvenile court conducted

---

[5]The DDA waiver, which the DDA receives from the federal Centers for Medicare and Medicaid Services, permits eligible participants to receive care in a home or in the community, instead of an institution. See Community Pathways Waiver, Department of Health and Mental Hygiene, http://dda.dhmh.maryland.gov/SITEPAGES/community%20 pathways.aspx [http://perma.cc/7A5G-LPDS].

[6]The letter also set forth Dustin's appeal rights, advising Dustin that he or his authorized representative could "request a Medicaid Fair Hearing at the Maryland Office of Administrative Hearings . . . by writing within ninety days of the date of th[e] letter[.]"

an annual guardianship review hearing. At the hearing, counsel for DHMH and DSS readily acknowledged that the dispute was over funding for Dustin's services, which Mr. P. and Mrs. P. wanted to continue after Dustin's twenty-first birthday. The juvenile court heard testimony from witnesses on Dustin's behalf, including: Dr. Richard Kelley, a pediatrician specializing in metabolic diseases, accepted as an expert in biochemical genetics and the complex nature of metabolic disease and its impact on bodily systems of children and adults, who had been caring for Dustin for approximately fifteen years; Stefania Bockmiller, a registered nurse, who had been caring for Dustin for nearly ten years, accepted as an expert in registered nursing care of medically complex and fragile patients in hospital and community settings; Mona Yudkoff, a registered nurse, accepted as an expert in registered nursing with a focus on rehabilitation and life care planning; Jay Balint, the executive director, president, and chief executive officer of MedSource; Sherry Davis, Dustin's resource coordinator; Mrs. P.; Laura Kress, the assistant director of nursing for nursing practice at Johns Hopkins Hospital; and A'lise Williams, director of DHMH's Board of Nursing, whose deposition testimony was admitted into evidence.

The juvenile court also heard testimony from witnesses on DHMH's behalf and DSS's behalf, including: Rosslyn Hill, Dustin's DSS social worker; Vanessa Bullock, the deputy director of the central Maryland regional office of DDA; and Marie Adams, a DDA registered nurse.

At the hearing, counsel for DHMH argued that the juvenile court lacked the statutory authority to order the relief that Dustin requested—namely, that services continue after his twenty-first birthday. Counsel for DSS argued that ordering the relief would

violate the separation of powers. By contrast, Dustin's counsel contended that the juvenile court had the statutory authority to order a plan of clinically appropriate services in the least restrictive setting.

At the conclusion of the hearing, the juvenile court orally ruled that DHMH's plan was clinically inadequate, stating:

> I expressed my concern over the position of [DSS]. They are his current guardian, [] yet they stand next to [DHMH] in . . . trying to convince [me] to cut benefits for Dustin.
>
> . . . It's a cutback of services and that's what they're proposing. And I'm not sure that's consistent with their obligations as guardian of his person.
>
> * * *
>
> This is a life and death issue for me. And I'm afraid th[at] DHMH and DSS really [are] not looking out through the eyes of it being a life and death issue.

The juvenile court identified two issues, namely, "what services are necessary[] to obtain the ongoing care needed after the guardianship terminates . . . at age" twenty-one, and whether DHMH's plan offered "clinically appropriate services in the least restrictive setting." The juvenile court stated that the following factual findings had been found to be proven "no matter what standard of proof" applied:

> 1. Dustin has a disability and is a medically fragile child per the [Code of Maryland Regulations] definition[.]
>
> 2. He needs ongoing care[.]
>
> 3. He needs clinically appropriate services, which is[,] ultimately, what I have to decide[.]
>
> 4. And that is keeping what he already has; it cannot be decreased, it's life-threatening if it's decreased, and his needs were the same and probably will

- 9 -

get more complicated as he gets older[.]

5. I believe that the P. residence is the least restrictive setting; I'm not sure anybody's going to dispute that he's been there since age two --

6. There are emotional ties[.]

7. We know a description of all the improvements done to that house[.]

8. Everyone that currently cares for him at the P. house knows what he needs[.]

[9]. I find clearly that 24/7 [registered nurse] care, which he's already getting[.]

And I'm not sure how anybody can dispute that finding because it's already been agreed to. It's already been acknowledged that's what works and that's what keeps him out of the hospital. Anybody [who] suggests that it should be decreased, whether it's motivated by money, just is not looking at this case objectively --

[10]. His needs will increase[.]

[11]. As I stated, maintaining the status quo, in my view, is a matter of life or death[.]

And you know the governmental agencies involved here, I guess I can say I'm a little annoyed, because to me, a deal is a deal. They made a deal with Dustin, they made a deal with the P.'s, and now they want to renege on that deal, and I just have a problem with that. . . . They just out-of-hand rejected the plan submitted, even though they knew it worked, and even though they knew it had been approved for the last six or seven years. . . .

[12]. The current arrangement works and should not be changed[.]

[13]. This case is a level-of-care issue[.]

I find that it's not only in the best interest of Dustin -- and if we value life at all this is a life-and-death matter, in the view of this particular member of the bench. . . .

[14]. A group home is clearly not appropriate[.]

[15]. And all of the services that he's currently getting, just so I'm clear[,] as defined by the statute[,] are "clinically appropriate services."

After making the factual findings above, the juvenile court addressed a two-page document that Dustin submitted entitled "Proposed Findings and Order," and the following exchange occurred:

[THE COURT:] So that's my decision. I've looked at the order, Proposed Findings of Fact and Order, and before I place my signature on it, are there any other comments regarding the order?

[COUNSEL FOR DHMH]: I would ask that the order list the specific services that the Court is ordering that [DHMH] fund.

THE COURT: Counsel, I don't need to do that. If you've been paying attention at this trial, you know what those services are. They're everything he's getting now. . . . [I]n my view[, they] are going to be necessary after he turns [twenty-one].

[COUNSEL FOR DHMH]: Does that include payments to Mrs. P.?

THE COURT: It includes everything. . . . It includes . . . exactly what he's getting now. . . . There is no need to change any of that.

The juvenile court signed the "Proposed Findings and Order," which reads, in full, as follows:

PROPOSED FINDINGS AND ORDER

On August 26-27, 2013 and September 27, 2013[,] a Guardianship Review Hearing was held and Dustin [] requests that the Court make the following Findings:

1) Dustin requires 24/7[,] one-on-one skilled nursing care provided by registered nurses [who] have been fully oriented to his care needs and have demonstrated competence in all of the tasks on the Skills Checklist developed by the supervising nurse.

2) Dustin requires the continuation of all services that will ensure that the agency is able to retain the current nurses [who] have been fully oriented

to continue to care for him[,] including[,] but not limited to[,] call-out pay, orientation, holiday pay, and vacation.

3) It is in Dustin's best interest to remain in the least restrictive setting in the home of the P[.] family[,] who are willing to continue to provide a home to him after he turns [twenty-one].

4) Dustin requires the continuation of all other services currently provided that enable Dustin to remain healthy and safe in the P[.] home.

5) DHMH has not provided a plan for Dustin of clinically appropriate services in the least restrictive setting.

6) That [another planned permanent living arrangement] is in Dustin's best interest because of his ongoing[,] extensive[,] and extraordinary medical conditions and his profound physical and developmental disabilities.

Further, Dustin requests that this Court:

1) ORDER that DHMH develop and approve a written plan that ensures that Dustin will continue to receive all of the services and supports [that] he is currently receiving[,] including[,] but not limited to[,] all services that will ensure that Dustin will receive 24/7, one-on-one skilled nursing care provided by registered nurses [who] have been fully oriented to his care needs and have demonstrated competence in all of the tasks on the Skills Checklist developed by the supervising nurse.

2) ORDER that ~~DSS~~[7] and DHMH each report to the [juvenile] court and all parties in writing monthly [] the specific steps taken to ensure that Dustin's current level of services and supports will continue in the P[.] home.

3) ORDER that the Stipulation of the parties dated April 26, 2005, shall continue to remain in effect;

4) ORDER that this matter be scheduled for hearing within [two] months[] for a Guardianship Review to determine adequacy of the progress toward the goal of achieving a seamless transition that will ensure Dustin's health and safety and maintain the continuity of his placement in the community in the P[.] home.

---

[7]At DSS's request, the juvenile court crossed out "DSS" and initialed the alteration.

- 12 -

5) ORDER that the Court continue to grant Mr. and Mrs. [] P. the authority to make medical (including mental, dental and vision health), educational[,] and out[-]of[-S]tate travel decisions on Dustin's behalf.[8]

At the bottom of the Proposed Findings and Order, the juvenile court judge signed on the signature line that had been provided. The judge announced: "The order is signed."[9]

After the guardianship review hearing, the clerk of the juvenile court made the following docket entries:

| Num/Seq | Description | Filed | Jdg |
|---------|-------------|-------|-----|
| 00168000 | Hearing Sheet | 09/27/13 | PFH |
| 00169000 | No Pro Se Party at time of Proceeding | 09/30/13 | TBA |
| 00170000 | Reasonable Efforts Made by DSS | 09/30/13 | TBA |
| 00171000 | Another Planned Permanent Living Arrangement | 09/30/13 | TBA |
| 00172000 | Proposed Finding and order | 09/30/13 | PFH |

On October 24, 2013, DHMH noted an appeal to the Court of Special Appeals.

On December 2, 2013, the juvenile court conducted another guardianship review hearing.[10] The juvenile court judge signed an order dated December 2, 2013, crossing out the word "Proposed," so the title read "~~PROPOSED~~ ORDER"; the order, as amended and

---

[8]The juvenile court denied DHMH's request to insert into the order a provision requiring Mrs. P. apply for guardianship of Dustin.

[9]At the hearing on September 27, 2013, the juvenile court also signed a second order, which had been drafted and submitted by DSS, that addressed routine guardianship review matters. The order did not reference DSS's or DHMH's responsibilities after Dustin's twenty-first birthday, and stated that the matter was scheduled to "be terminated on December 16, 2013[,]" Dustin's twenty-first birthday.

[10]The previous guardianship review hearing was conducted by, and the September 27, 2013 order was signed by, the Honorable Paul F. Harris, Jr. The December 2, 2013, guardianship review hearing was conducted by the Honorable Philip T. Caroom.

signed by the juvenile court judge, provided, in pertinent part:

~~PROPOSED~~ ORDER

Upon a Guardianship Review Hearing on December 2, 2013 and the Findings made by [the juvenile court] on September 27, 2013, this Court hereby issues the following:

[] ORDER that DHMH develop[,] approve[, and] supply to counsel for other parties by 12/9, 2013 "close of business[,]" a written plan that ensures that Dustin will continue to receive the services [that] he is currently receiving[,] including[,] but not limited to[,] all services that will ensure that Dustin will receive 24/7, one-on-one skilled nursing care provided by registered nurses [who] have been fully oriented to his care needs and have demonstrated competence in all of the tasks on the Skills Checklist developed by the supervising nurse.

* * *

[] ORDER that this matter be scheduled for hearing 12/12, 2013, at 1:30 p.m. . . . for a Guardianship Review to determine adequacy of the progress toward the goal of achieving a seamless transition that will ensure Dustin's health and safety and maintain the continuity of his placement in the community in the P[.] home. If there is a signed, approved Service Funding Agreement and there are no outstanding issues, the parties shall notify the court and the hearing will be canceled[.]

After the December guardianship review hearing, the clerk of the juvenile court made the following docket entries:

| Num/Seq | Description | Filed | Jdg |
|---------|-------------|-------|-----|
| 00180000 | Hearing Sheet | 12/02/13 | PTC |
| 00181000 | No Pro Se Party at time of Proceeding | 12/02/13 | TBA |
| 00182000 | Order of Court | 12/03/13 | PTC |

On December 11, 2013, DHMH entered into a contract with MedSource Community Services, Inc. for "MedSource to implement the [September 27, 2013] Order and the Plan, pending the outcome of [DHMH]'s appeal of the Order[.]"

On appeal, although neither DHMH nor Dustin raised any issue as to the appealability of the juvenile court's September 27, 2013 order, in an unreported opinion dated December 22, 2014, a three-judge panel of the Court of Special Appeals dismissed DHMH's appeal on its own initiative, a majority holding that the September 27, 2013 order was not a final, appealable order; accordingly, the Court of Special Appeals did not reach the merits. Specifically, the Court of Special Appeals determined that, although "[t]he hearing transcript le[ft] no doubt that the [juvenile] court subjectively intended to render an unqualified, final disposition of the claim[,]" "the document executed by the [juvenile court] did not adjudicate the claim, and, objectively speaking, it was not a final order"; and, "although the clerk made a record of the document that the [juvenile court] signed, the docket entry did nothing to indicate that anything had actually been determined." Notably, the Honorable Andrea M. Leahy dissented, stating that the juvenile court signed the proposed order, consistent with its oral rulings on the record, and that the juvenile court and the parties intended the signed proposed order to be a final, appealable order.

On January 21, 2015, Dustin filed in this Court a petition for a writ of *certiorari*, raising the following three issues:

> 1. Does an alleged scrivener's error in the form of an order and docket entry render the order invalid and require dismissal of an appeal, even if it might deprive an extraordinarily medically fragile youth of life-sustaining relief?
>
> 2. Did the juvenile court exceed its authority under the guardianship law by ordering DHMH to enter into a plan to obtain the same life-sustaining care for a youth aging out of the system that he has received for the last ten years?
>
> 3. Is a juvenile court order requiring a State agency to develop and approve a plan to obtain ongoing life-sustaining care for a ward of the court, entered pursuant to express provisions of the guardianship statute, unconstitutional

- 15 -

under the separation-of-powers doctrine?

On February 5, 2015, DHMH filed an answer and cross-petition for a writ of *certiorari*, raising the following three issues:

1. Did the Court of Special Appeals err in dismissing [DHMH]'s appeal from an order granting an injunction?

2. Is Dustin [] required to use the available administrative remedy to challenge [DHMH]'s decision on funding for the services [that] he will receive after his [twenty-fir]st birthday?

3. Did the juvenile court exceed its authority in ordering [DHMH] to develop, approve, and implement a plan to provide specified services to Dustin []?

On April 17, 2015, this Court granted the petition and denied the cross-petition. See In re: Adoption/Guardianship of Dustin R., 442 Md. 515, 113 A.3d 624 (2015).

## STANDARD OF REVIEW

"An appellate court reviews without deference a [lower] court's interpretation of a statute[.]" Howard v. State, 440 Md. 427, 434, 103 A.3d 572, 576 (2014) (citation omitted).

## DISCUSSION

### I. Appealability

Both Dustin and DHMH contend that the juvenile court's order is appealable as an interlocutory order granting an injunction, and that the Court of Special Appeals erred in dismissing DHMH's appeal on its own initiative. We agree. The September 27, 2013 order was immediately appealable at a minimum as an interlocutory order granting injunctive relief.

Md. Code Ann., Cts. & Jud. Proc. (1973, 2013 Repl. Vol.) ("CJP") § 12-303(3)(i) provides that an order granting an injunction is an appealable interlocutory order, stating:

> A party may appeal from any of the following interlocutory orders entered by a circuit court in a civil case: . . . [a]n order[ g]ranting or dissolving an injunction, but if the appeal is from an order granting an injunction, only if the appellant has first filed his [or her] answer in the cause[.]

(Paragraph breaks omitted). Maryland Rule 15-501(a) defines an "injunction" as "an order mandating or prohibiting a specified act." In State Comm'n on Human Relations v. Talbot Cnty. Det. Ctr., 370 Md. 115, 139, 803 A.2d 527, 541 (2002), we explained: "An injunction is a writ framed according to the circumstances of the case commanding an act which the court regards as essential to justice, or restraining an act which it esteems contrary to equity and good conscience." (Citation and internal quotation marks omitted). "Injunctive relief is relief prohibiting someone from doing some specified act or commanding someone to undo some wrong or injury . . . generally, it is a preventive and protective remedy, aimed at future acts, and it is not intended to redress past wrongs." Colandrea v. Wilde Lake Cmty. Ass'n, Inc., 361 Md. 371, 394-95, 761 A.2d 899, 911 (2000) (ellipsis in original) (citation, internal quotation marks, and emphasis omitted).

Although the Maryland Rules do not define "order," in Prince George's Cnty. v. Vieira, 340 Md. 651, 661, 667 A.2d 898, 903 (1995), we described an "order" as follows: "[A]n 'order' emanates from a court and, in fact, constitutes a command or decree of the court." For purposes of contempt of a court order, the Court of Special Appeals has stated that "the order must be sufficiently definite, certain, and specific in its terms so that the party may understand precisely what conduct the order requires." Droney v. Droney, 102

Md. App. 672, 684, 651 A.2d 415, 421 (1995) (citations omitted). If the order is sufficiently definite, then parties must comply with the dictates of the order, and a party may be held in contempt for "willful" noncompliance. Royal Inv. Grp., LLC v. Wang, 183 Md. App. 406, 448, 961 A.2d 665, 689 (2008), cert. dismissed, 409 Md. 413, 975 A.2d 875 (2009).

Here, it is plainly evident that the juvenile court's September 27, 2013 order was an "order" as that term is understood, and that it was an order that at a minimum granted injunctive relief to Dustin. The record demonstrates that the juvenile court ordered DHMH to develop, approve, and implement a plan to provide ongoing services to Dustin. As such, the order granted injunctive relief because it was "a writ framed according to the circumstances of the case commanding an act which the court regard[ed] as essential to justice[.]" State Comm'n on Human Relations, 370 Md. at 139, 803 A.2d at 541. It is obvious that the order was, indeed, an order. The juvenile court orally ruled and signed the "Proposed Findings and Order" submitted by Dustin; in its oral ruling, the juvenile court made factual findings, including findings consistent with those contained in Dustin's proposed findings, and determined on the record that Dustin was entitled to the relief that he requested. The juvenile court then stated that it granted Dustin's request that DHMH perform the acts specified in the "proposed" order. After some discussion about a requested alteration to the text of the "proposed" order, and the juvenile court's resolution of that request, the juvenile court announced that "[t]he order is signed"; clearly, that the order was titled "Proposed Findings and Order" was of no significance at all. Put plainly, by signing the "proposed" order, the juvenile court made the "proposed" order into an

- 18 -

actual order, and clearly intended the order as a binding command to the parties. That the juvenile court did not strike out the word "Proposed" in the title, or otherwise alter the prefatory language (*i.e.*, "Dustin [] requests" and "Dustin requests"), is not dispositive of whether the order is, in fact, an order.[11]

The record demonstrates that the juvenile court at a minimum granted mandatory injunctive relief to Dustin, as confirmed by: (1) the positions taken by the parties in the Court of Special Appeals and this Court, *i.e.*, the lack of any contest whatsoever as to the appealability of the order; and (2) more importantly, the juvenile court's subsequent order of December 2, 2013, requiring DHMH's compliance with the September 27, 2013 order by the close of business on December 9, 2013. Both parties had actual notice of the entry of the September 27, 2013 order and its terms, as both were present at the hearing. See Md. R. 15-502(d) ("An injunction is not binding on a person until that person has been personally served with it or has received actual notice of it by any means."). That the docket entry simply noted entry of the order under the title of the order—"Proposed Finding[s] and Order"—is of no consequence; it is clear that the courtroom clerk simply entered the title of the document as the docket entry.

In sum, we hold that the Court of Special Appeals erred in dismissing the appeal

---

[11]Notably, when discussing the one proposed alteration to the order (striking out the reference to DSS), and despite the juvenile court soliciting further comments on the order prior to signing the order, neither Dustin nor DHMH requested that the word "Proposed" or the prefatory language of "Dustin requests" be stricken from the order. In other words, ostensibly, neither Dustin nor DHMH believed that the word "Proposed" or the prefatory language rendered the order null.

because the juvenile court's order was appealable at a minimum as an interlocutory order granting injunctive relief. See CJP § 12-303(3)(i). It is clear that, here, the juvenile court signed an order setting forth the relief requested by Dustin, and both parties understood the order to be the juvenile court's command or decree. Having held that the appeal was erroneously dismissed, we address the merits of the issues presented to this Court.[12]

## II. Statutory Authority and Jurisdiction

Dustin contends that the juvenile court was authorized to order DHMH to enter into a plan to obtain "life-sustaining services" for him to continue after he reached age twenty-one. Dustin argues that Md. Code Ann., Fam. Law (1984, 2012 Repl. Vol.) ("FL") § 5-324(b)(1)(ii)(7)(B) and (8) protect children with disabilities transitioning to adult care and grant the juvenile court the power, before Dustin turned twenty-one, to order DHMH to obtain ongoing care for him that would be needed after he turned twenty-one, and to order DHMH to submit a plan of clinically appropriate services in the least restrictive setting for him. Dustin asserts that the statute's plain language is unambiguous in this regard. Dustin maintains that the juvenile court's common law *parens patriae* powers enable it to protect him.

DHMH responds that the juvenile court lacked the authority to order it to develop, approve, and implement a plan to provide services to Dustin after his twenty-first birthday because, under FL § 5-328(a)(2), the juvenile court had limited statutory jurisdiction

---

[12]We hold that the September 27, 2013 order was appealable, at a minimum, as an interlocutory order granting injunctive relief and, applying judicial restraint, without opining on the merits of the Court of Special Appeals's final judgment analysis, we need not address whether the order was also appealable as a final judgment.

extending only until Dustin attained the age of twenty-one, and, under FL § 5-324(b)(1)(ii), the juvenile court lacked the authority to order services after the conclusion of its jurisdiction. DHMH argues that the plain language and legislative history of the statutes confirm that the juvenile court lacked the authority to order it to provide services or funding after Dustin's twenty-first birthday.

For the following reasons, we agree with Dustin.

The statutes' plain language leads to the conclusion that the juvenile court had the authority to order DHMH to provide services for Dustin to continue after he reached age twenty-one. "As a court of limited jurisdiction, the juvenile court may exercise only those powers granted to it by statute." In re Ryan W., 434 Md. 577, 602, 76 A.3d 1049, 1064 (2013) (citations omitted); see also Smith v. State, 399 Md. 565, 574, 924 A.2d 1175, 1180 (2007) ("We have held that juvenile courts, as statutorily created courts of limited jurisdiction, may exercise only those powers expressly designated by statute."). Pursuant to FL § 5-328(a), if a local department is a child's guardian, as is the circumstance here, the juvenile court:

> (1) retains jurisdiction until:
>      (i) the child attains 18 years of age; or
>      (ii) the juvenile court finds the child to be eligible for emancipation;
> and
>
> (2) may continue jurisdiction until the child attains 21 years of age.

In other words, the juvenile court's jurisdiction extends only "until the child attains 21 years of age." FL § 5-328(a)(2).

FL § 5-324(b)(1), concerning the grant of guardianship and accompanying order,

provides, in pertinent part:

> In a separate order accompanying an order granting guardianship of a child, a juvenile court:
>
> . . .
>
> (ii) consistent with the child's best interests:
>
> . . .
>
>> 7. shall direct the provision of any other service or taking of any other action as to the child's education, health, and welfare, including:
>>
>> . . .
>>
>>> B. for a child with a disability, services to obtain ongoing care, if any, needed after the guardianship case ends; and
>>>
>>> 8. may co-commit the child to the custody of [DHMH] and order [DHMH] to provide a plan for the child of clinically appropriate services in the least restrictive setting, in accordance with federal and State law[.[13]]

We must construe FL § 5-328(a) and FL § 5-324(b)(1)(ii) to determine whether the statutes authorized the juvenile court to order DHMH to provide services to Dustin after his twenty-first birthday. In doing so, we reiterate: "In interpreting a statute, a court first considers the statute's language, which the court applies where the statute's language is unambiguous and clearly consistent with the statute's apparent purpose." Hailes v. State, 442 Md. 488, 495, 113 A.3d 608, 612 (2015) (citation and internal quotation marks omitted).

---

[13]FL § 5-324(b)(1)(ii) applies to orders that are issued at guardianship review hearings. See FL § 5-326(a)(8)(viii) ("At each guardianship review hearing for a child, a juvenile court shall: . . . take all other action that the juvenile court considers to be in the child's bests interests, including any order allowed under [FL] § 5-324(b)(1)(ii)[.]").

- 22 -

*Plain Language*

We unequivocally hold that the juvenile court had jurisdiction and the statutory authority to order DHMH to develop and approve a plan that ensured that Dustin would continue to receive services, where Dustin was not yet twenty-one years old when the juvenile court issued its order and where such services were required to protect Dustin's health and welfare; in other words, the juvenile court had jurisdiction and statutory authority to issue the September 27, 2013 order to DHMH to provide services for Dustin after age twenty-one. By its plain language, FL § 5-328(a) provides that, in cases where the local department is a child's guardian, the juvenile court "retains jurisdiction[] until the child attains 18 years of age[,]" but that it "may continue jurisdiction until the child attains 21 years of age." (Paragraph break omitted). In other words, although the juvenile court's jurisdiction ordinarily ends once a child turns eighteen years old, the juvenile court's jurisdiction "may" extend until the child turns twenty-one years old. FL § 5-328(a)(2). Indeed, when read in its logical order, FL § 5-328(a)(2) states, in its entirety: "If a local department is a child's guardian under this subtitle, a juvenile court: [] may continue jurisdiction until the child attains 21 years of age." (Paragraph break omitted). By contrast, FL § 5-328(a)(1)(i) states, in its entirety: "If a local department is a child's guardian under this subtitle, a juvenile court: [] retains jurisdiction until[] the child attains 18 years of age[.]" (Paragraph breaks omitted).

FL § 5-328(a)(2)'s use of the word "may" is significant because it indicates a legislative intent to provide the juvenile court with the discretion to extend its jurisdiction over a guardianship matter past the ordinary cut-off date of a child's eighteenth birthday.

See, e.g., Anne Arundel Cnty. Ethics Comm'n v. Dvorak, 189 Md. App. 46, 83, 983 A.2d 557, 579 (2009) ("[T]he word 'may,' when used in a statute, usually implies some degree of discretion." (Citation and some internal quotation marks omitted)). In other words, under FL § 5-328(a)(2), if the juvenile court exercises its discretion to extend its jurisdiction in a guardianship proceeding past a child's eighteenth birthday, the juvenile court is not thereafter divested of jurisdiction in that guardianship proceeding until the child turns twenty-one years old. Thus, the juvenile court has the authority to act, even if a child is twenty years and three hundred and sixty-four days old. What this means is that the juvenile court in the instant case had jurisdiction to issue both the September 27, 2013 order and the December 2, 2013 order because Dustin was twenty years old at the time those orders were issued; indeed, Dustin did not turn twenty-one years old until December 16, 2013. FL § 5-328(a)(2)'s plain language leads to the conclusion that the juvenile court's jurisdiction continues until a child turns twenty-one, not that the juvenile court's order is no longer effective when a child reaches age twenty-one.

Accordingly, we turn to FL § 5-324(b)(1)(ii)(7)(B) and (8) to determine whether the juvenile court had the statutory authority to order DHMH to develop and approve a written plan of clinically appropriate services in the least restrictive setting that ensured that Dustin would continue to receive the services that he was then receiving. FL § 5-324(b)(1)(ii)(7)(B) states:

> In a separate order accompanying an order granting guardianship of a child, a juvenile court: . . . consistent with the child's best interests: . . . shall direct the provision of any other service or taking of any other action as to the child's education, health, and welfare, including: . . . for a child with a disability, services to obtain ongoing care, if any, needed after the

- 24 -

guardianship case ends[.]

By its plain language, FL § 5-324(b)(1)(ii)(7)(B) provides that, prior to termination of the guardianship case (*i.e.*, before the juvenile court is divested of jurisdiction), the juvenile court must order a party to provide any service or take any other action to obtain any ongoing care needed to protect the health of a child with disabilities after he or she turns twenty-one years old.  In other words, FL § 5-324(b)(1)(ii)(7)(B)'s purpose is to ensure that services are provided for, if needed, *i.e.*, that care is in place before a child turns twenty-one years old, so that there is no gap in care between the end of the juvenile guardianship case and transition into the adult guardianship system.

Indeed, such judicial action is mandated by FL § 5-324(b)(1)(ii)(7)(B), which provides that the juvenile court "shall direct" the provision of such services.  See, e.g., Dove v. State, 415 Md. 727, 738, 4 A.3d 976, 982 (2010) ("[T]he word 'shall' indicates the intent that a provision is mandatory."  (Citations omitted)).  Furthermore, FL § 5-324(b)(1)(ii)(7)(B)'s plain language—specifically, "any other service or taking of any other action"—encompasses a multitude and variety of services or actions.  "Any" means, in relevant part, "one, some, or all indiscriminately of whatever quantity" and is "used to indicate a maximum or whole[.]"  Any, Merriam-Webster (2015), http://www.merriam-webster.com/dictionary/any [http://perma.cc/W9FK-M476].  "Service" means "help, use, benefit" or a "contribution to the welfare of others[,]" and can include "a facility supplying some public demand[.]"  Service, Merriam-Webster (2015), http://www.merriam-webster.com/dictionary/service [http://perma.cc/NA66-8PYS].  And, "action" means "[t]he process of doing something; conduct or behavior" or "[a] thing done[.]"  Black's

Law Dictionary (10th ed. 2014). Thus, FL § 5-324(b)(1)(ii)(7)(B) authorizes—indeed, requires—the juvenile court to order any service or action, without limitation, consistent with the child's bests interests.

In the case of "a child with a disability," FL § 5-324(b)(1)(ii)(7)(B) requires the juvenile court to direct the provisions of "services to obtain ongoing care, if any, needed after the guardianship case ends[.]" "Obtain" means "to gain or get (something) usually by effort" or "to gain or attain usually by planned action or effort[.]" Obtain, Merriam-Webster (2015), http://www.merriam-webster.com/dictionary/obtain [http://perma.cc/UH42-KJLE]. "Ongoing" means "continuing to exist, happen, or progress" or "continuing without reaching an end[.]" Ongoing, Merriam-Webster (2015), http://www.merriam-webster.com/dictionary/ongoing [http://perma.cc/R2QK-J9LU]. And, "care" means "things that are done to keep someone healthy, safe, etc.[,]" and clearly encompasses foster care and nursing care. Care, Merriam-Webster (2015), http://www.merriam-webster.com/dictionary/care [http://perma.cc/C8JN-V8VU]. Thus, FL § 5-324(b)(1)(ii)(7)(B)'s plain language requires that the juvenile court take action before a child with a disability turns twenty-one years old (*i.e.*, before the guardianship case ends) to direct the provision of services needed to obtain ongoing care that the child will require after turning twenty-one years old.

In short, FL § 5-324(b)(1)(ii)(7)(B) unambiguously provides that, while a juvenile court has jurisdiction in a guardianship case (*i.e.*, before a child turns twenty-one years old, assuming the juvenile court has exercised its discretion to extend its jurisdiction pursuant to FL § 3-528(a)(2)), the juvenile court is required, consistent with the best interests of a

child with a disability, to direct the provision of any service or the taking of any action necessary for the child's health and welfare, including services to obtain ongoing care that may be needed after the guardianship case ends. Here, the juvenile court acted in accordance with the express authority conferred on it by FL § 5-324(b)(1)(ii)(7)(B). In the September 27, 2013 order, the juvenile court directed DHMH to take action to ensure that Dustin continued receiving ongoing services necessary for his health and well-being. As discussed above, because Dustin was twenty years old at the time, the juvenile court had jurisdiction over the guardianship case. And, as Dustin is disabled, FL § 5-324(b)(1)(ii)(7)(B) directed the juvenile court to take action before Dustin turned twenty-one years old to obtain the ongoing care that Dustin would need after the guardianship case ended on his twenty-first birthday.

We perceive no merit in DHMH's contention that FL § 5-324(b)(1)(ii)(7)(B) limits the juvenile court's authority to order the guardian to apply for public benefits or entitlements that would take effect after a child turns twenty-one years old, and that the juvenile court could not order the guardian or another to provide a particular service after the guardianship case ends. As an initial matter, FL § 5-324(b)(1)(ii)(7)(B)'s plain language does not limit the services or actions that the juvenile court can and must order; indeed, FL § 5-324(b)(1)(ii)(7)(B) authorizes the juvenile court to order any and all services needed to obtain ongoing care for a child with a disability, not just services that assist the child in obtaining care once he or she turns twenty-one years old. And, lest there be any confusion, we reiterate that FL § 5-324(b)(1)(ii)(7)(B) authorizes the juvenile court to order services to obtain ongoing care needed after the guardianship case ends; FL § 5-

324(b)(1)(ii)(7)(B) does not extend the juvenile court's jurisdiction or otherwise permit the juvenile court, after the guardianship case has ended, to direct the provision of services or the taking of actions. Stated otherwise, FL § 5-324(b)(1)(ii)(7)(B) authorizes the juvenile court, while it has jurisdiction and while the guardianship case is ongoing, to order the provision of services to obtain ongoing care to be provided after the guardianship case ends, but FL § 5-324(b)(1)(ii)(7)(B) does not authorize the juvenile court to order anything once the guardianship case has ended. Had the juvenile court issued its order after Dustin's twenty-first birthday, our analysis in this case would differ. Simply put, though, FL § 5-324(b)(1)(ii)(7)(B) does not run afoul of the jurisdiction granted to the juvenile court by FL § 5-328(a), but instead grants the juvenile court the authority to order services to obtain ongoing care in the case of a child with a disability while the juvenile court has jurisdiction.

Moreover, FL § 5-324(b)(1)(ii)(7), unlike other subsubparagraphs in FL § 5-324(b)(1)(ii), does not limit the juvenile court to ordering DSS to take action or provide services, but rather authorizes the juvenile court to direct the provision of any services or the taking of any action as to the child's welfare. For example, FL § 5-324(b)(1)(ii)(2) states that the juvenile court "may direct provision of services by a local department [of social services] to: A. the child; or B. the child's caregiver[.]" (Paragraph breaks omitted). And, FL § 5-324(b)(1)(ii)(3) states that the juvenile court, "subject to a local department [of social services] retaining legal guardianship, may award to a caregiver limited authority to make an emergency or ordinary decision as to the child's care, education, mental or physical health, or welfare[.]" Because FL § 5-324(b)(1)(ii) includes language in subsubparagraphs (2) and (3) limiting the juvenile court's order to DSS, but does not

contain such language in subsubparagraph (7), such an omission is presumed to be intentional. See, e.g., Miller v. Miller, 142 Md. App. 239, 251, 788 A.2d 717, 723, aff'd sub nom. Goldberg v. Miller, 371 Md. 591, 810 A.2d 947 (2002) (Using one of the rules of statutory construction, negative implication, in a particular Supreme Court case, "the Court reasoned that, when Congress included particular language in one section of a statute, but omitted it in another section of the same act, it could be presumed that Congress acted intentionally and purposely in the disparate inclusion or exclusion." (Citations omitted)).

FL § 5-324(b)(1)(ii)(8) provides that, consistent with a child's best interest, the juvenile court "may co-commit the child to the custody of [DHMH] and order [DHMH] to provide a plan for the child of clinically appropriate services in the least restrictive setting, in accordance with federal and State law[.]" By its plain language, FL § 5-324(b)(1)(ii)(8) authorizes the juvenile court to order DHMH to submit a plan of clinically appropriate services in the least restrictive setting for a child who is co-committed to DHMH. That is exactly what occurred here. Dustin was already co-committed to DHMH as of April 2013, and the juvenile court ordered DHMH to develop and approve a plan of clinically appropriate services—including "24/7, one-on-one skilled nursing care provided by registered nurses"—to serve Dustin in the P. home, which the juvenile court determined to be the least restrictive setting. Indeed, given the juvenile court's factual findings—which DHMH has not challenged in this Court—we have no difficulty in concluding that the juvenile court was correct in ordering DHMH to develop and provide a plan for the minimum level of clinically appropriate services necessary for Dustin in the P. home. FL § 5-324(b)(1)(ii)(8) is unambiguous, and the juvenile court adhered to it in this case.

We are unpersuaded by DHMH's contention that FL § 5-324(b)(1)(ii)(8) does not permit the juvenile court to order "specific services[.]" The September 27, 2013 order directed DHMH "to develop and approve a written plan that ensure[d] that Dustin w[ould] continue to receive all of the services and supports [that] he [was then] current[ly] receiving[.]" The order left the contours of the plan up to DHMH, which had the flexibility and discretion on how to fashion a plan that complied with the requirement of providing Dustin with the services and supports that he had been receiving for a number of years prior to the guardianship review hearing. For example, nothing in the juvenile court's order required DHMH to continue using MedSource as the provider of Dustin's nursing care. Indeed, how to comply with the juvenile court's order and which providers to use were left entirely to DHMH. When read in context of the juvenile court's factual findings, the juvenile court's order directed DHMH to provide a specific level of care because DHMH's plan failed to provide clinically appropriate services in the least restrictive setting. And, in any event, pursuant to FL § 5-324(b)(1)(ii)(8), in conjunction with FL § 5-324(b)(1)(ii)(7)(B), the juvenile court had the authority not only to order DHMH to provide a plan for Dustin of clinically appropriate services in the least restrictive setting, but also to direct the provision of services to obtain ongoing care for Dustin to continue after his twenty-first birthday (*i.e.*, to order DHMH to implement the plan so that Dustin would continue receiving the services he was then receiving).

In sum, we hold that, under the plain language of FL §§ 3-528(a)(2), 3-524(b)(1)(ii)(7)(B), and 3-524(b)(1)(ii)(8), the juvenile court had both the jurisdiction and statutory authority to order DHMH to develop and approve a written plan of clinically

- 30 -

appropriate services in the least restrictive setting that ensured that Dustin would continue to receive the services that he was then receiving, where Dustin was not yet twenty-one years old when the juvenile court issued its order, where such services were required to protect Dustin's health and welfare, and where it was necessary for the juvenile court to order services to bridge the gap as Dustin transitioned from his juvenile guardianship case to the adult guardianship system.[14]

### *Relevant Legislative History*

Although the plain language of the relevant statutes is unambiguous and our analysis could end at this point, we nonetheless address the legislative history on which DHMH relies.

We are aware that, in 2013, the General Assembly considered and rejected a proposal to amend FL § 5-328 to extend the juvenile court's jurisdiction over cases involving children who are medically fragile until age twenty-three; the General Assembly also rejected an amendment that would have authorized the juvenile court to review the content and enforcement of certain plans with respect to medically fragile children. See S.B. 1010, Third Reading (Mar. 29, 2013), at 6, available at http://www.mgaleg.maryland.gov/2013RS/bills/sb/sb1010t.pdf [http://perma.cc/E6LY-WGC8]. Specifically, Senate Bill 1010 would have amended FL § 5-328(a)(2), such that the statute would have read as follows:

> (a) If a local department is a child's guardian under this subtitle, a juvenile court:

---

[14]In the subsection entitled "The Bridge," *infra*, we explain the precise contours of the bridge.

. . .

(2) may continue jurisdiction:

**(I)** until the child attains 21 years of age**; OR**

**(II) IF THE CHILD IS MEDICALLY FRAGILE AND HAS A DEVELOPMENTAL DISABILITY, FOR 2 ADDITIONAL YEARS AFTER THE CHILD ATTAINS 21 YEARS OF AGE FOR THE JUVENILE COURT TO REVIEW, AS NECESSARY, THE <u>CONTENT</u>, IMPLEMENTATION, AND ENFORCEMENT OF THE CHILD'S TRANSITION PLAN, INDIVIDUAL SERVICE PLAN, OR SERVICE FUNDING PLAN DEVELOPED AND IMPLEMENTED UNDER § 5-525.3 OF THIS TITLE OR § 7-804 OF THE HEALTH – GENERAL ARTICLE.**

<u>Id.</u> (bolding and underlining in original). Senate Bill 1010 was passed by the Senate before failing in the House of Delegates. <u>See</u> S.B. 1010, History, http://mgaleg.maryland.gov/webmga/frmMain.aspx?pid=billpage&stab=03&id=sb1010&tab=subject3&ys=2013rs [http://perma.cc/W6QB-XYAN].

DHMH's reliance on this legislative history is a red herring. Whether the General Assembly rejected an amendment to extend the juvenile court's jurisdiction in guardianship cases to age twenty-three in the case of medically fragile children has no bearing whatsoever in this case, where the juvenile court acted while it had jurisdiction, *i.e.*, before Dustin turned twenty-one years old. Thus, that the General Assembly rejected such an amendment extending the juvenile court's jurisdiction is simply not relevant and does not assist this Court with ascertaining the General Assembly's intent as to a juvenile court's authority when it has jurisdiction; indeed, what can be gleaned from the rejection of the proposed amendment is that the General Assembly "did not intend to achieve the results

- 32 -

that the amendment would have achieved, if adopted." State v. Bell, 351 Md. 709, 721, 720 A.2d 311, 317 (1998) (citations omitted). Thus, that the General Assembly did not intend to extend the juvenile court's jurisdiction in guardianship cases to age twenty-three in the case of medically fragile children is of no consequence.

The General Assembly enacted FL § 5-324 as part of the Permanency for Families and Children Act of 2005. See 2005 Md. Laws 2581, 2628-29 (Ch. 464, S.B. 710). As originally proposed, FL § 5-324(b)(1)(ii) contained only seven subsubparagraphs, including FL § 5-324(b)(1)(ii)(7), but not FL § 5-324(b)(1)(ii)(8). See S.B. 710, First Reading (Feb. 4, 2005), at 50-52, available at http://www.mgaleg.maryland.gov/2005rs/bills/sb/sb0710f.pdf [http://perma.cc/BP27-VAAF]. However, the Public Justice Center, a non-profit legal organization, supported by the Foster Care Court Improvement Project, proposed adding an eighth subsubparagraph to what would become FL § 5-324(b)(1)(ii) to read as follows:

> (8) May co-commit the child to the custody of the Department of Health and Mental Hygiene and order the Department of Health and Mental Hygiene to provide such services as the court finds to be in the child's best interest.

Letter from Kevin Slayton, Policy Director of the Public Justice Center, to Brian E. Frosh, Chairperson, and Members of the Judicial Proceedings Committee (Feb. 23, 2005). According to the Public Justice Center:

> **This additional language is needed to ensure that the court has all appropriate options available to meet the needs of these children.** The court may find it necessary to order such co-commitment for children with severe developmental disabilities or complex medical issues. [Senate B]ill [710,] as currently drafted[,] gives the court a finite list of choices, does not address this option, and does not include any broad catch-all language permitting the court to make other orders that it considers to be in the best

- 33 -

interest of the child.

Id. (emphasis added).  In its memorandum supporting amending FL § 5-324(b)(1)(ii) to add the eighth subsubparagraph proposed by the Public Justice Center, the Foster Care Court Improvement Project explained why it supported the amendment, stating:

> [DHMH] would have the same fiscal responsibility to provide services to severely disabled children as they do now.  The amended bill would simply make [DHMH] legally responsible.  These are the same children that the court already has the authority under the [Child in Need of Assistance] statute . . . to co-commit to DSS and DHMH.  Please also note that very few cases would be affected since there are few severely disabled children that go through a [termination of parental rights] process.

Memorandum from Althea R. Stewart Jones, Director of the Foster Care Court Improvement Project, to Delegate Theodore J. Sophocleus (Apr. 6, 2005).

Ultimately, the Senate amended Senate Bill 710 to add subsubparagraph FL § 5-324(b)(1)(ii)(8) as proposed by the Public Justice Center, except for substituting "any services" for "such services."  Amendments to Senate Bill No. 710 (First Reading File Bill), Judicial Proceedings Committee (Mar. 22, 2005), at 1, available at http://www.mgaleg.maryland.gov/2005rs/amds/bil_0000/sb0710_07897801.pdf [http://perma.cc/KY89-BJVL].  DHMH objected to the breadth of the proposed language and opposed Senate Bill 710 as amended, urging the Judicial Proceedings Committee to issue "an unfavorable report."  As a result, the House of Delegates revised FL § 5-324(b)(1)(ii)(8) to eliminate the phrase "any services that the court finds to be in the child's best interests" and replace it with the phrase "a plan for the child of clinically appropriate services in the least restrictive setting, in accordance with federal and State law."  Amendment to Senate Bill No. 710 (Third Reading File Bill), Delegate Hubbard (Apr. 8,

- 34 -

2005), available at http://www.mgaleg.maryland.gov/2005rs/amds/bil_0000/sb0710_8936 2402.pdf [http:// perma.cc/6W5C-W5SQ]; see also 2005 Md. Laws at 2629. Notably, the House of Delegates did not oppose Senate Bill 710 in its entirety as DHMH urged, but instead amended and passed Senate Bill 710. Accordingly, the General Assembly enacted FL § 5-324(b)(1)(ii)(8) as amended by the House of Delegates. See 2005 Md. Laws at 2629. Amending the language in Senate Bill 710 from "any services that the court finds to be in the child's best interests" to the language currently in FL § 5-324(b)(1)(ii)(8)—"a plan for the child of clinically appropriate services in the least restrictive setting, in accordance with federal and State law"—demonstrates only the General Assembly's intent to narrow the scope of the juvenile court's order under FL § 5-324(b)(1)(ii)(8). Indeed, the amended language still authorizes the juvenile court to order DHMH to provide such a plan where a child is co-committed to DHMH. Moreover, we note that amendment to FL § 5-324(b)(1)(ii)(8) before its enactment has no effect whatsoever on FL § 5-324(b)(1)(ii)(7)(B)'s plain language, and does not demonstrate any legislative intent to limit the juvenile court to particular boundaries when ordering the provision of services or actions to obtain needed ongoing care for a child with a disability.

Additionally, Senate Bill 710's Fiscal and Policy Note addressed the impact of Senate Bill 710 on DHMH, noting at the outset that there was a "[p]otential significant general fund expenditure increase for . . . DHMH[] to provide plans for clinically appropriate treatment services that may be ordered by a juvenile court." S.B. 710 Fiscal and Policy Note Revised, at 1, available at http://www.mgaleg.maryland. gov/2005rs/fnotes/bil_0000/sb0710.pdf [http://perma.cc/6WVN-7YW8]. Senate Bill

710's Fiscal and Policy Note later explained in greater detail:

> There could be a potentially significant increase in general fund expenditures for DHMH to provide the services that may be required by [Senate B]ill[ 710].

> [Senate B]ill [710] authorizes a juvenile court to co-commit a child who is the subject of a guardianship petition to the custody of DHMH, as well as to a local department of social services. DHMH may then be ordered to provide a plan of clinically appropriate treatment services for the child in the least restrictive setting that conforms to State and federal law. The order for co-commitment could affect the Administrations of Medical Care Programs, Mental Hygiene, and Developmental Disabilities. DHMH advises that while some services may already be provided to these children if they are Medicaid-eligible and the services are considered medically necessary, there is still likely to be a significant fiscal impact, affecting . . . DDA[] to the greatest degree.

> According to the Judiciary, 895 guardianship petitions were filed in circuit courts in fiscal 2004. [The Department of Human Resources] advises that as many as 250 children annually could be co-committed to DHMH under the provisions of [Senate B]ill[ 710]. However, the Department of Legislative Services advises that because the juvenile court only has discretion to co-commit children to DHMH and is not mandated to do so, there is insufficient data to estimate accurately how many children a juvenile court may decide to order into a co-custody arrangement with DHMH for services. Also, [Senate B]ill [710] requires that DHMH provide a plan for clinically appropriate treatment, but does not specifically require that DHMH implement the plan. If DHMH provided a plan for treatment services only, that could substantially mitigate the additional costs of [Senate B]ill[ 710]. *However, by way of illustration*, general fund expenditures for DHMH could increase by $10 million annually if a juvenile court co-committed 125 children to the custody of DDA annually, DDA was ordered to provide a clinically appropriate treatment plan for each child, and DDA was ordered to implement each plan.

Id. at 6-7 (emphasis in original). In other words, Senate Bill 710's Fiscal and Policy Note expressly recognized that, although Senate Bill 710—specifically, what is now FL § 5-324(b)(1)(ii)(8)—"does not specifically require that DHMH implement the plan" that a juvenile court may order it to provide, the juvenile court could order DHMH to "implement

- 36 -

each plan[,]" in which circumstance, there "could be a potentially significant increase in general fund expenditures for DHMH to provide the services that may be required[.]" Id. at 6-7. Thus, Senate Bill 710's Fiscal and Policy Note bolsters our reading of FL §§ 5-324(b)(1)(ii)(7)(B) and (8)—that FL § 5-324(b)(1)(ii)(8) authorizes the juvenile court to order DHMH to provide a written plan of clinically appropriate services in the least restrictive setting, and FL § 5-324(b)(1)(ii)(7)(B) authorizes the juvenile court to order DHMH to implement that plan and, indeed, provide any other service or take any other action to obtain ongoing care for a child with a disability that is needed after the guardianship case ends. In short, the legislative history on which DHMH relies does not alter the plain meaning of FL §§ 5-324(b)(1)(ii)(7)(B) and (8), but rather supports affirmance of the juvenile court's orders.

### *Common Law Parens Patriae Authority*

In addition to having both jurisdiction and statutory authority to issue the September 27, 2013 order and the December 2, 2013 order, the juvenile court had authority to act in accord with Dustin's best interests pursuant to its common law *parens patriae* authority. In Wentzel v. Montgomery Gen. Hosp., Inc., 293 Md. 685, 702, 447 A.2d 1244, 1253 (1982), we described *parens patriae* authority, stating:

> The *parens patriae* jurisdiction of circuit courts in this State is well established. The words "*parens patriae*," meaning "father of the country," refer to the State's sovereign power of guardianship over minors and other persons under disability. It is a fundamental common law concept that the jurisdiction of courts of equity over such persons is plenary so as to afford whatever relief may be necessary to protect the individual's best interests.

(Citations omitted). And, more recently, in In re Najasha B., 409 Md. 20, 33-34, 972 A.2d

845, 852-53 (2009), in the context of a child in need of assistance case, we elaborated:

> The State of Maryland has a *parens patriae* interest in caring for those, such as minors, who cannot care for themselves and the child's welfare is a consideration that is of transcendent importance when the child might be in jeopardy. In furtherance of this interest, we have recognized that in cases where abuse or neglect is evidence, particularly in a [child in need of assistance] case, the court's role is necessarily more pro-active. The juvenile court, acting under the State's *parens patriae* authority, is in the unique position to marshal the applicable facts, assess the situation, and determine the correct means of fulfilling a child's best interests.

(Citations, ellipsis, and internal quotation marks omitted). To that end, in Montgomery Cnty. Dep't of Soc. Servs. v. Sanders, 38 Md. App. 406, 418, 381 A.2d 1154, 1162 (1977), the Court of Special Appeals stated that the juvenile court "stands as a guardian of all children, and may interfere at any time and in any way to protect and advance [a child's] welfare and interests." (Citation and internal quotation marks omitted).

Here, the juvenile court had broad authority under its common law *parens patriae* authority to act in Dustin's best interests to provide for Dustin's ongoing care as he aged out of the juvenile guardianship system and transitioned into the adult guardianship system, particularly where Dustin is a child with extraordinary disabilities who cannot care for himself. The State has the ultimate responsibility for the health and welfare of those children with disabilities who are under guardianship. Thus, even if FL §§ 5-324(b)(1)(ii)(7)(B) and (8) were ambiguous as to the juvenile court's authority—which they are not—we would nevertheless hold that, under the circumstances of this case, involving a child indisputably in need of life-sustaining services, common law *parens patriae* authority empowered the juvenile court to act as it did to issue an order requiring DHMH to have ongoing care in place for Dustin after he turns twenty-one years old and

ages out of the child welfare system. Stated otherwise, absent clear statutory language prohibiting the juvenile court from acting as it did, the juvenile court had inherent authority and discretion pursuant to its common law *parens patriae* authority to act to provide life-sustaining services.

### *Practical Considerations*

Additionally, practical concerns support our holding. As *Amici curiae*[15] explain, if the juvenile court were not authorized to order that clinically appropriate services in the least restrictive setting be provided and in place before a child ages out of the child welfare system, "gaps or outright lapses in care would almost certainly occur." Brief of *Amici Curiae* First Star, Inc., et al. in Support of Dustin, at 22. This outcome would clearly run afoul of the juvenile court's responsibility to act in the best interests of a child and to protect the child's health and welfare. As such, *Amici curiae* contend that the authority exercised by the juvenile court in this case is an authority that is broadly exercised by juvenile courts across the State:

> [T]he sheer breadth of juvenile court orders that would be precluded under DHMH's view would work a sea change in the practical—and long unquestioned—operation of the juvenile court. Such a change would have significant if not disastrous consequences, not only for guardianship children but for the administrability of the child welfare system. The juvenile courts are responsible for managing guardianship cases and determining the

---

[15]*Amici curiae* "include non-profit organizations, professional associations, and private law firms dedicated to protecting the rights of children and at-risk populations[,]" namely: First Star, Inc.; Advocates for Children and Youth; the Baltimore Child Abuse Center; the Coalition to Protect Maryland's Children; the Family Tree; the Franklin Law Group, P.C.; Hope Forward, Inc.; the Law Offices of Darlene A. Wakefield, P.A.; the Maryland Chapter of the National Association of Social Workers; the Maryland State Council on Child Abuse and Neglect; the Public Justice Center; and Randall & Sonnier, LLC.

appropriate level of care for guardianship children, and in that capacity juvenile courts have routinely ordered state agencies to provide a broad array of services—everything from drug treatment, psychological and neuropsychological evaluations, therapy and medical devices[,] to housing assistance, vocational training, and transportation assistance. Precluding the juvenile court from issuing such orders, as DHMH's position here would do, would fundamentally alter the juvenile court's authority, and would, as a practical matter, strip that court of its central role in managing guardianship cases. Not only would such a result be harmful to guardianship children, but it would also create serious fiscal and administrative problems for the [S]tate. If the juvenile court is found to lack the authority to order state agencies to provide the broad range of services that it currently orders, then disputes over whether the service is necessary and who should pay for it will be pursued through the administrative appeal process. That route will be expensive, cumbersome, and inefficient—serving neither the interests of guardianship children or the [S]tate.

According to *Amici curiae*, adopting "DHMH's position would strip the juvenile court of its ability to enter numerous orders for which its authority had previously been unquestioned." To the extent that *Amici curiae* are correct, for this Court to essentially pull the rug out from under the juvenile court and read FL §§ 5-324(b)(1)(ii)(7)(B) and (8) contrary to their plain language would render uncertainty throughout the juvenile courts of this State, and would render juvenile courts unable to enter orders consistent with the best interests of the child. We decline to do so.

### *"The Bridge"*

As a final matter, although we hold that the juvenile court had statutory authority under FL §§ 5-324(b)(1)(ii)(7)(B) and (8) to act as it did, that statute serves to provide a bridge in services as a child transitions from the juvenile guardianship system and into the adult guardianship system. In other words, FL §§ 5-324(b)(1)(ii)(7)(B) and (8) do not serve as the basis for creating an entitlement to particular services for all time.

- 40 -

Indeed, we pause to make clear that the juvenile court may order services pursuant to FL §§ 5-324(b)(1)(ii)(7)(B) and (8) to bridge the gap as Dustin transitions from a juvenile guardianship to an adult guardianship and obtains services through the adult guardianship system. The services ordered by the juvenile court cannot and do not continue necessarily until Dustin's demise. Rather, services ordered by the juvenile court to bridge the gap continue only until such time as the child transitions into an adult guardianship and his or her guardian(s) seeks authorization for the provision of the same or substantially similar services as those ordered by the juvenile court through the Medicaid fair hearing process. See Code of Maryland Regulations 10.01.04–10.01.12 ("Fair Hearing Appeals Under the Maryland State Medical Assistance Program"). The burden is on the child's guardian to proceed with the adult guardianship process and to seek the Medicaid fair hearing; the child's guardian cannot stand idle and do nothing after a juvenile court orders a bridge in services. Thus, here, the burden is on Mr. and Mrs. P. to proceed with moving Dustin into the adult guardianship system,[16] and, if DHMH persists in wanting to provide services different materially than as directed by the juvenile court, to seek a Medicaid fair hearing to obtain the same or substantially similar services as those ordered by the juvenile court as necessary to protect Dustin's health and welfare going forward. DHMH should have every incentive to assist Mr. and Mrs. P. through the process. In the meantime, the juvenile court's order, which was lawfully issued pursuant to the juvenile court's statutory and *parens patriae* authority, remains in effect, and the juvenile court has the power to

---

[16]It is our understanding that Mr. and Mrs. P. were, in fact, awarded adult guardianship of Dustin after he turned twenty-one years old.

enforce its order until such time as Dustin goes through the Medicaid fair hearing process (if necessary) and is provided the life-sustaining services he requires. See CJP § 1-202(a) ("A court may exercise the power to punish for contempt of court or to compel compliance with its commands in the manner prescribed by Title 15, Chapter 200 of the Maryland Rules."); Md. R. 15-205–207 (Constructive Contempt); Dodson v. Dodson, 380 Md. 438, 448, 845 A.2d 1194, 1199 (2004) ("[T]he purpose of civil contempt is to coerce present or future compliance with a court order, whereas imposing a sanction for past misconduct is the function of criminal contempt." (Citation omitted)). Obviously, the juvenile court anticipated the ability to enforce its order. In its order of December 2, 2013, the juvenile court ordered a review scheduled for December 12, 2013, four days before Dustin turned twenty-one; it would be illogical to conclude that the juvenile court intended for DHMH's plan to be effective for only four days until Dustin's twenty-first birthday on December 16, 2013.

### *Conclusion*

In conclusion, we reiterate that we hold that the juvenile court had jurisdiction and statutory authority to order DHMH to develop and approve a written plan of clinically appropriate services in the least restrictive setting that ensured that Dustin would continue to receive the services that he was then receiving, where Dustin was not yet twenty-one years old when the juvenile court issued its order and where such services were required to protect Dustin's health and welfare, and where the juvenile court's order served to bridge the gap in services as Dustin transitioned from his juvenile guardianship case to adult guardianship care.

### III. Separation of Powers

DHMH contends that the juvenile court's order violates the separation of powers because it interferes with DHMH's "administration of its programs and budget by ordering services without regard to the funds appropriated to pay for such services or [DHMH]'s regulations governing the provision of such services[.]"  On the other hand, Dustin contends that the juvenile court's order does not violate the separation of powers because it acted pursuant to express statutory authority.  We agree with Dustin and explain.

Article 8 of the Maryland Declaration of Rights provides: "That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other."  Article 8 of the Maryland Declaration of Rights "explicitly prohibit[s] one branch of government from assuming or usurping the power of any other branch."  Getty v. Carroll Cnty. Bd. of Elections, 399 Md. 710, 730, 926 A.2d 216, 229 (2007).  In O'Hara v. Kovens, 92 Md. App. 9, 20, 606 A.2d 286, 291, cert. denied, 328 Md. 93, 612 A.2d 1316 (1992), cert. denied, 507 U.S. 920 (1993), the Court of Special Appeals remarked that "[t]here is no concept more fundamental to our system of government than the doctrine of separation of powers among the legislative, executive, and judicial branches."  Nevertheless, "[d]espite its language, the [separation of powers] doctrine has never been so rigidly applied," as Article "8 of the Maryland Declaration of Rights does not impose a complete separation [among] the branches of government."  McCulloch v. Glendening, 347 Md. 272, 283, 701 A.2d 99, 104 (1997) (citation and internal quotation marks omitted).

Here, the juvenile court did not violate the separation of powers. As discussed above, FL §§ 5-328(a)(2), 5-324(b)(1)(ii)(7)(B), and 5-324(b)(1)(ii)(8) expressly authorized and empowered the juvenile court to act as it did. As Dustin's counsel pointed out in his brief and at oral argument, the issue is not whether the juvenile court improperly exercised judicial power to the detriment of the executive branch, but instead the issue is one of statutory interpretation, *i.e.*, whether the General Assembly delegated the authority to the juvenile court to act as it did in this case. Perhaps tellingly, DHMH does not contend that the General Assembly lacked the authority to enact the statutes at issue in this case or that the statutes themselves are unconstitutional. We note that "enactments of the [General Assembly] are presumed to be constitutionally valid and [] this presumption prevails until it appears that the [statute] is invalid or obnoxious to the expressed terms of the Constitution or to the necessary implication afforded by, or flowing from, such expressed provisions." Dep't of Nat. Res. v. Linchester Sand & Gravel Corp., 274 Md. 211, 218, 334 A.2d 514, 520 (1975) (citations omitted).[17] Absent any argument by DHMH that the

---

[17]DHMH's reliance on Md. State Dep't of Health and Mental Hygiene v. Prince George's Cnty. Dep't of Soc. Servs., 47 Md. App. 436, 423 A.2d 589 (1980) is misplaced. In that case, the Court of Special Appeals held that a juvenile court lacked jurisdiction to order DHMH to pay for the costs of maintaining a child in need of assistance in a private hospital. See id. at 441, 423 A.2d 592. After concluding that the juvenile court lacked the authority to order DHMH to pay for the child's care at a private hospital, holding that the statute at issue "empower[ed] the court to commit a child to the custody of DHMH[, but did] not confer upon the court any right to mandate the specific terms of the commitment[,]" id. at 445, 423 A.2d at 594, the Court of Special Appeals addressed, in *dicta*, the separation of powers doctrine and concluded that the juvenile court's order "invade[d] the Executive department by directing the Secretary of DHMH to pay out monies for a purpose not funded by the [General Assembly] nor requested by the Executive[,]" and "intruded on the Legislative Branch by directing the funding of [the

- 44 -

statutes at issue are unconstitutional or that the General Assembly improperly delegated

authority to the juvenile court, we discern no basis on which to conclude that the juvenile

court violated the separation of powers in the instant case, where it acted according to

express statutory authority.[18]

---

child]'s private hospital confinement[,]" id. at 452, 423 A.2d at 597. Notably, the discussion of the separation of powers doctrine was *dicta*. And, as discussed in In re Demetrius J., 321 Md. 468, 476, 583 A.2d 258, 262 (1991), the statute at issue in Md. State Dep't of Health and Mental Hygiene was later amended to "permit[] the court to name the type of facility but generally bestow[ed] no authority on the court to specify a particular facility." Thus, as to that point, Md. State Dep't of Health and Mental Hygiene is no longer good law.

[18]In its brief, DHMH also contends that the juvenile court lacked the authority to enter the order because Dustin failed to exhaust his administrative remedies to challenge DHMH's plan for providing services to him after he turned twenty-one before seeking relief from the juvenile court. According to DHMH, Dustin was required to challenge its plan through the Medicaid fair hearing process. We need not address the issue because we denied the cross-petition for a writ of *certiorari*, in which DHMH raised the issue; significantly, Dustin did not raise an issue as to exhaustion of administrative remedies in the petition for a writ of *certiorari*, which this Court granted. In other words, the issue concerning exhaustion of administrative remedies is not before this Court, as we limited our grant of *certiorari* to those issues raised in the petition for a writ of *certiorari*. See Md. R. 8-131(b)(1) ("Unless otherwise provided by the order granting the writ of certiorari, in reviewing a decision rendered by the Court of Special Appeals . . . , the Court of Appeals ordinarily will consider only an issue that has been raised in the petition for certiorari or any cross-petition and that has been preserved for review by the Court of Appeals."); Robinson v. Bunch, 367 Md. 432, 440, 788 A.2d 636, 641 (2002) ("This Court has consistently taken the position, under [Maryland] Rule 8-131(b) and under our certiorari practice prior to the adoption of a rule on the subject, that in our order granting certiorari, . . . we may either limit the issues or add issues which the parties have not presented in certiorari petitions or cross-petitions." (Citations omitted)); Dempsey v. State, 277 Md. 134, 143, 355 A.2d 455, 459 (1976) ("[N]ot only did the State fail to raise in a timely fashion the [issue] . . . , but the issue was not embraced in our order granting the writ of certiorari. Where this Court's order granting *certiorari* limits the issues to be considered, no additional questions will ordinarily be dealt with even if such additional questions were raised in the petition or in a cross-petition." (Citation omitted)).

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY. RESPONDENT TO PAY COSTS.**